No. 2022-1378

# United States Court of Appeals for the Federal Circuit

BRODRICK JAMAR JENKINS,

*Plaintiff-Appellant*,

*v.*

UNITED STATES,

*Defendant-Appellee.*

Appeal from the United States District Court
for the District of North Dakota, No. 3:19-cv-00188-ARS

**BRIEF OF APPELLANT BRODRICK JAMAR JENKINS**

James Burnham
H. Hunter Bruton
*Counsel of Record*
Megan E. Ball
Teressa Hamsher
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
hbruton@jonesday.com
jburnham@jonesday.com
meball@jonesday.com
thamsher@jonesday.com

*Counsel for Appellant Brodrick Jamar Jenkins*

# CERTIFICATE OF INTEREST

Case No. 2022-1378

*Brodrick Jamar Jenkins v. United States*

Filing Party/Entity: Brodrick Jamar Jenkins

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: May 20, 2022 Signature: */s/ H. Hunter Bruton*

Name: H. Hunter Bruton

**1. Represented Entities** (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

(a) Brodrick Jamar Jenkins

**2. Real Party in Interest** (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None

**3. Parent Corporations and Stockholders** (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Not Applicable

**4. Legal Representatives** – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

**Federal Public Defender**: Christopher J. Lancaster

**5. Related Cases** – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

None

**6. Organizational Victims and Bankruptcy Cases** – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not Applicable

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .......... i
STATEMENT OF RELATED CASES .......... xii
REQUEST FOR ORAL ARGUMENT .......... xiii
STATEMENT OF JURISDICTION .......... 1
INTRODUCTION .......... 2
STATEMENT OF THE ISSUES .......... 4
STATEMENT OF THE CASE .......... 5
A. Impounding of Mr. Jenkins' Vehicles .......... 6
B. Criminal Proceedings .......... 7
C. Mr. Jenkins' Unsuccessful Fed. R. Crim. P. 41(g) Motion to Recover His Property .......... 11
D. Procedural History of this Civil Suit .......... 12
SUMMARY OF ARGUMENT .......... 17
STANDARD OF REVIEW .......... 18
ARGUMENT .......... 19
I. PHYSICAL APPROPRIATIONS CATEGORICALLY REQUIRE JUST COMPENSATION .......... 20
A. The United States Owes Just Compensation for Physically Appropriating Mr. Jenkins' Personal Property .......... 22
1. Per se physical appropriations trigger just compensation .......... 22
2. The just-compensation duty is categorical .......... 24
3. These foundational takings rules require just compensation here .......... 25
B. No "Police-Power" Exception Allows the Federal Government to Avoid Just Compensation When It Physically Appropriates Property and Does Not Return It .......... 27

**TABLE OF CONTENTS**
(continued)

**Page**


1. Limited precedent allowing the federal government to temporarily hold property prior to the conclusion of a criminal or forfeiture proceeding does not apply here ........ 29

2. Invocation of a "police power" does not end takings analysis ........ 33

II. THE LITTLE TUCKER ACT WAIVES SOVEREIGN IMMUNITY FOR MR. JENKINS' DUE-PROCESS CLAIM ........ 45

A. The Little Tucker Act Waives Sovereign Immunity for Mr. Jenkins' Claim that the United States Illegally Exacted His Property Without Due Process ........ 48

B. There is No "Money Mandating" Requirement to a Claim Stating an Illegal Exaction ........ 53

CONCLUSION ........ 57

## TABLE OF AUTHORITIES

**Page(s)**

*Acadia Tech., Inc. v. United States*,
458 F.3d 1327 (Fed. Cir. 2006) .......... 30

*Aerolineas Argentinas v. United States*,
77 F.3d 1564 (Fed. Cir. 1996) .......... *passim*

*AmeriSource Corp. v. United States*,
525 F.3d 1149 (Fed. Cir. 2008) .......... 31

*Ark. Game & Fish Comm'n v. United States*,
568 U.S. 23 (2012) .......... 24, 44

*Armstrong v. United States*,
364 U.S. 40 (1960) .......... 34

*Atari, Inc. v. JS & A Grp., Inc.*,
747 F.2d 1422 (Fed. Cir. 1984) .......... 18

*Baker v. City of McKinney*,
No. 21-CV-00176, 2021 WL 5390550
(E.D. Tex. Nov. 18, 2021) .......... 38

*Boeing Co. v. United States*,
968 F.3d 1371 (Fed. Cir. 2020) .......... 46, 48, 54, 56

*Bowman v. United States*,
35 Fed. Cl. 397 (1996) .......... 14, 55

*BP Chems. Ltd. v. Jiangsu SOPO Corp.*,
420 F.3d 810 (8th Cir. 2005) .......... 19

*Carter v. United States*,
62 Fed. Cl. 365 (2004) .......... 29

*Casitas Mun. Water Dist. v. United States*,
708 F.3d 1340 (Fed. Cir. 2013) .......... 20

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) .......... *passim*

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Chi., Rock Island & Pac. Ry. Co. v. United States*,
284 U.S. 80 (1931) .......... 37

*Delano Farms Co. v. Cal. Table Grape Comm'n*,
655 F.3d 1337 (Fed. Cir. 2011) .......... 18

*Eastport S.S. Corp. v. United States*,
372 F.2d 1002 (Ct. Cl. 1967) .......... 46, 54, 56

*First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty., Cal.*,
482 U.S. 304 (1987) .......... 24, 35

*Fla. Rock Indus., Inc. v. United States*,
791 F.2d 893 (Fed. Cir. 1986) .......... 36

*Ford Motor Co. v. United States*,
635 F.3d 550 (Fed. Cir. 2011) .......... 14

*Froudi v. United States*,
22 Cl. Ct. 290 (1991) .......... 12, 36

*Fuentes v. Shevin*,
407 U.S. 67 (1972) .......... 49

*Garcia Carranza v. United States*,
67 Fed. Cl. 106 (2005) .......... 30

*Haw. Hous. Auth. v. Midkiff*,
467 U.S. 229 (1984) .......... 35, 37

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) .......... 24, 25, 26, 28

*In re Am. Fertility Soc'y*,
188 F.3d 1341 (Fed. Cir. 1999) .......... 56

*Ins. Co. of W. v. United States*,
243 F.3d 1367 (Fed. Cir. 2001) .......... 19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*John Corp. v. City of Houston*,
214 F.3d 573 (5th Cir. 2000) .......... 38

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979) .......... 24, 39

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
790 F.3d 1298 (Fed. Cir. 2015) .......... 18, 19

*Kelo v. City of New London*,
545 U.S. 469 (2005) .......... 35, 36

*Knick v. Twp. of Scott*,
139 S. Ct. 2162 (2019) .......... 25, 30, 43

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) .......... 36

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) .......... 37, 38

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) .......... 28, 39, 40

*Mallow v. United States*,
161 Ct. Cl. 446 (1963) .......... 47

*Martinez v. United States*,
333 F.3d 1295 (Fed. Cir. 2003) (en banc) .......... 46, 53

*McCutchen v. United States*,
14 F.4th 1355 (Fed. Cir. 2021) .......... 40

*McDonald's Corp. v. United States*,
926 F.2d 1126 (Fed. Cir. 1991) .......... 56

*Metro. Prop. & Cas. Ins. Co. v. Calvin*,
802 F.3d 933 (8th Cir. 2015) .......... 19

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Murray v. United States*,
817 F.2d 1580 (Fed. Cir. 1987) .......... 23

*New Hampshire v. Maine*,
532 U.S. 742 (2001) .......... 53

*Norman v. United States*,
429 F.3d 1081 (Fed. Cir. 2005) .......... 55

*Pa. Coal Co. v. Mahon*,
260 U.S. 393 (1922) .......... 38

*Patty v. United States*,
136 Fed. Cl. 211 (2018) .......... 44

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) .......... 24

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980) .......... 40

*Pumpelly v. Green Bay & Miss. Canal Co.*,
80 U.S. 166 (1871) .......... 35

*R. J. Widen Co. v. United States*,
357 F.2d 988 (Ct. Cl. 1966) .......... 23

*Raz v. Lee*,
343 F.3d 936 (8th Cir. 2003) (per curiam) .......... 56

*Reid v. United States*,
148 Fed. Cl. 503 (2020), *amended*, 149 Fed. Cl. 328 (2020) .......... 46

*Reynolds v. Army & Air Force Exch. Serv.*,
846 F.2d 746 (Fed. Cir. 1988) .......... 19

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) .......... 36

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Steward v. United States*,
80 Fed. Cl. 540 (2008) .......... 32

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) .......... 22, 24

*Titus v. Sullivan*,
4 F.3d 590 (8th Cir. 1993) .......... 18, 48

*TrinCo Inv. Co. v. United States*,
722 F.3d 1375 (Fed. Cir. 2013) .......... 41, 42

*United States v. Bailey*,
700 F.3d 1149 (8th Cir. 2012) .......... 8, 45, 53

*United States v. Clarke*,
445 U.S. 253 (1980) .......... 20

*United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*,
461 U.S. 555 (1983) .......... 42

*United States v. Gen. Motors Corp.*,
323 U.S. 373 (1945) .......... 23

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) .......... 49

*United States v. Lopez*,
514 U.S. 549 (1995) .......... 40

*United States v. Morrison*,
529 U.S. 598 (2000) .......... 40

*United States v. One (1) 1979 Cadillac Coupe De Ville VIN 6D4799266999*,
833 F.2d 994 (Fed. Cir. 1987) .......... 30

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. Premises Known as 608 Taylor Ave., Apartment 302, Pittsburgh, Pa.*, 584 F.2d 1297 (3d Cir. 1978) ........ 42

*United States v. Testan*, 424 U.S. 392 (1976) ........ 54, 56

*United States v. U.S. Coin & Currency*, 401 U.S. 715 (1971) ........ 42

*United States v. Wilson*, 540 F.2d 1100 (D.C. Cir. 1976) ........ 43

*Warden v. Hayden*, 387 U.S. 294 (1967) ........ 42

*Yuba Goldfields, Inc. v. United States*, 723 F.2d 884 (Fed. Cir. 1983) ........ 22

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. Amendment V ........ *passim*

U.S. Const. Amendment IX ........ 40, 41

U.S. Const. Amendment X ........ 40

U.S. Const. Article I, § 8 ........ 40

18 U.S.C. § 981 ........ 50

18 U.S.C. § 983 ........ 50

18 U.S.C. § 3101 *et seq.* ........ 50

21 U.S.C. § 853 ........ 50

21 U.S.C. § 881 ........ 50

28 U.S.C. § 1295(a)(2) ........ 1

28 U.S.C. § 1346(a)(2) ........ 1, 20, 46

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

28 U.S.C. § 2465(a)(1) ........ 43, 50

Minnesota Statute § 168B.06(a) ........ 6, 52

**OTHER AUTHORITIES**

28 C.F.R. § 8.10(e) ........ 10, 50

Fed. R. Crim. P. 41 ........ 11, 29, 30, 50, 53

U.S. Dep't of Just., Asset Forfeiture Policy Manual (2013) ........ 10, 50

U.S. Dep't of Just., Asset Forfeiture Policy Manual (2021) ........ 10, 50

## STATEMENT OF RELATED CASES

There has been no other appeal in or from this case, and Appellant Brodrick Jamar Jenkins is not aware of any other pending case that will directly affect, or be directly affected by, the Court's decision in this case.

**REQUEST FOR ORAL ARGUMENT**

In accordance with Federal Rule of Appellate Procedure 34(a), Plaintiff-Appellant Brodrick Jamar Jenkins respectfully requests oral argument. This appeal raises important constitutional issues concerning (1) a constitutionally unjustifiable expansion of a limited "police power" exception to the otherwise categorical rule that the federal government must pay for property it physically appropriates, and (2) the scope of the Little Tucker Act's waiver of sovereign immunity for illegal-exaction claims. Oral argument would substantially aid the Court in its analysis of this case.

## STATEMENT OF JURISDICTION

*District Court Jurisdiction:* This is an appeal from a judgment in a civil case of the U.S. District Court for the District of North Dakota. The district court had jurisdiction over this matter pursuant to the Little Tucker Act, 28 U.S.C. § 1346(a)(2).

*Appellate Jurisdiction:* On November 2, 2021, the district court entered final judgment. Appx25. Mr. Jenkins timely filed his Notice of Appeal in the U.S. Court of Appeals for the Eighth Circuit on November 29, 2021. Appx177-83. The Eighth Circuit transferred the case to this Court on January 12, 2022. Appx184. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(2).

## INTRODUCTION

The federal government seized Plaintiff-Appellant Brodrick Jamar Jenkins' two vehicles as part of a criminal investigation, failed to return the vehicles as the law requires, and now refuses to provide Mr. Jenkins with just compensation for the vehicles. Mr. Jenkins diligently pursued available remedies in his criminal proceeding to have his vehicles returned. Initially, the federal government stated that it would return them. But eventually, Mr. Jenkins learned that the government had stored the vehicles at an impound lot that had auctioned them off. It is undisputed that the United States never provided Mr. Jenkins notice of where the vehicles were being held or that they would be auctioned. And it is undisputed that the United States never pursued federal forfeiture proceedings to dispossess Mr. Jenkins of his property outside the context of the criminal proceeding. Mr. Jenkins accordingly filed this Little Tucker Act suit seeking just compensation or damages under the Fifth Amendment's Takings and Due Process Clauses. Rather than pay for its physical appropriation, the United States has maintained that it owes Mr. Jenkins nothing.

The lower court issued two orders agreeing with the United States, both of which rest on fundamental legal errors. The lower court dismissed Mr. Jenkins' due-process claim, concluding that it did not fall within the Little Tucker Act's waiver of sovereign immunity because the Due Process Clause is not "money mandating" under this Court's precedent. And subsequently, the lower court granted summary judgment for the United States on the takings claim after concluding that, because the *initial* seizure was an exercise of a federal "police power," there could be no compensable taking.

On the takings claim, when the federal government physically appropriates property, it constitutes a taking, and the Fifth Amendment imposes a "clear and categorical obligation" to provide just compensation. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021). And where, as here, the United States seizes property and does not return the property or pursue forfeiture proceedings, neither the Supreme Court's nor this Court's precedent provides a "police power" escape hatch to the Fifth Amendment's required remedy. Mr. Jenkins is accordingly entitled to just compensation.

On the jurisdictional dismissal of the due-process claim, it is well established that the Little Tucker Act provides a waiver of sovereign immunity for due-process claims like Mr. Jenkins'—that is, claims against the United States alleging that property was improperly exacted without due process. *See Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996). This waiver applies regardless of whether the Due Process Clause is "money mandating." And it covers Mr. Jenkins request for damages if his takings claim falters for any reason.

Under either theory of recovery, this Court should reverse and remand for further proceedings in light of the lower court's errors.

## STATEMENT OF THE ISSUES

1. Whether the magistrate judge erred in holding that Mr. Jenkins could not assert a compensable takings claim arising from the federal government's physical appropriation of his property outside of federal forfeiture proceedings simply because the federal government's initial seizure fell under a limited exception for *temporary* deprivations in direct furtherance of law enforcement functions.

2. Whether the magistrate judge erred in dismissing Mr. Jenkins' due-process claim despite the Little Tucker Act's waiver of sovereign immunity for claims against the United States alleging that property was improperly exacted in contravention of due process.

## STATEMENT OF THE CASE

The federal government seized Mr. Jenkins' vehicles during a criminal investigation. Rather than seek forfeiture or return the vehicles when the criminal proceedings came to an end, the federal government instead relinquished possession to an impound lot that sold the vehicles at auction. Appx17-18. After unsuccessfully attempting to recover the property as part of his criminal proceeding, Mr. Jenkins brought this civil suit against the United States under the Little Tucker Act to recover just compensation or damages for his vehicles, which he is entitled to under the Fifth Amendment's Takings and Due Process Clauses. Appx16-17.

The present appeal arises from a grant of summary judgment for the United States on Mr. Jenkins' takings claim, after a magistrate judge dismissed Mr. Jenkins' due-process claim in an earlier jurisdictional order. Appx15, Appx23-24. The following facts are taken

from the magistrate's limited jurisdictional factfinding from the earlier dismissal order supplemented by undisputed facts outlined in the pleadings. The magistrate's jurisdictional factfinding was the sole basis for converting the United States' motion for judgment on the pleadings to a motion for summary judgment. Appx02-05, Appx17-18.

### A. Impounding of Mr. Jenkins' Vehicles

In spring 2011, the U.S. Drug Enforcement Agency ("DEA") began to investigate Mr. Jenkins. Appx53. On October 11, 2012, DEA Task Force agents executed search warrants at Mr. Jenkins' residence in St. Paul, Minnesota. Appx18, Appx53. "While executing the search warrants at Mr. Jenkins' residence, DEA Task Force agents seized both of Jenkins' vehicles and had them towed to the impound lot of Twin Cities Transport and Recovery in Oakdale, Minnesota." Appx55, Appx58, Appx18.

Mr. Jenkins' mother, Stephanie Buchanan, was the registered owner of the vehicles, but Mr. Jenkins remained the actual owner and retained exclusive and sole use of the vehicles. Appx116, Appx126, Appx128. Per Minnesota Statute § 168B.06(a), "[w]hen an impounded vehicle is taken into custody, the unit of government or impound lot

operator taking it into custody shall give written notice of the taking within five days." Neither the government nor the impound lot provided this initial notice to Mr. Jenkins or his mother. Appx18-19, Appx09.

While seeking a federal search warrant for the vehicles, "law enforcement put 'a hold' on the vehicles." Appx18. While on "hold" by the government, the impound lot was not permitted to institute any processes for selling or disposing of the vehicles. *See* Appx03. After the federal government received the warrant, the government executed the search warrant on the vehicles at the impound lot on October 24, 2012. Appx18, Appx53, Appx58-60. Both vehicles remained at the impound lot after the DEA Task Force agents completed the search. Appx18, Appx53. During this time, the government again did not provide any notice to Mr. Jenkins or his mother about the whereabouts of the vehicles.

### B. Criminal Proceedings

Almost six months later, on April 10, 2013, Mr. Jenkins pled guilty to conspiracy with intent to distribute and to distributing a controlled substance. Appx17, Appx52 (citing No. 3:12-cr-91 (D.N.D.)).

On October 31, 2013, he was sentenced to 252 months' imprisonment. Appx17, Appx52. Mr. Jenkins remains in federal custody.

Ten days prior to his sentencing, the State of Minnesota Bureau of Criminal Apprehension ("BCA") had "released holds" on Mr. Jenkins' two vehicles. Appx18. The record is silent as to whether the BCA had a possessory interest over the vehicles or whether the federal government gave the BCA control over the vehicles. Regardless, "the United States is responsible for property that is considered as evidence in a federal trial even if it is in the actual possession of state officials." *United States v. Bailey*, 700 F.3d 1149, 1153 (8th Cir. 2012).

On the day that the BCA released the holds, the owner and manager of the impound lot claims to have sent letters to Mr. Jenkins' mother, stating that the vehicles were available to be reclaimed upon payment of towing and storage charges. *See* Appx91-92, Appx104-05, Appx107-08, Appx111-12, Appx18. The owner's declaration in this litigation included attached exhibits that appear to be electronic reproductions of the letters. Appx107 (addressed to a "Bhuchanan [sic], Stephanie."), Appx111. The impound lot also claims to have sent "Final Notice" letters to Mr. Jenkins' mother, on February 12, 2014, explaining

that failure to "reclaim the vehicle[s]. . . within 10 days shall be a waiver by you of all right, title, and interest in the vehicle[s] and consent to the sale of the vehicle[s]." Appx105-06, Appx109-10, Appx113-14.[1] Sent by the impound lot *over a year after the vehicles were seized*, these letters are the only communication that the United States introduced into the record that allegedly provided notice to Mr. Jenkins' mother about the impounded vehicles.

Mr. Jenkins and his mother, however, did not receive these notices. The letters were sent to an out-of-date, former address at which neither Mr. Jenkins nor his mother resided. Appx19, Appx127-28. Further, "no other family members or others known to" Mr. Jenkins and his mother resided at the Minneapolis address where the notices were sent. Appx128, Appx04-05, Appx19. And at the time of the February 2014 mailing, Mr. Jenkins' mother was also in federal custody. Appx04-05, Appx19.

In short, neither Mr. Jenkins nor his mother had notice of the initial impoundment, and the United States does not claim that it

[1] The magistrate represented that the United States' declaration stated "February 2, 2014", Appx18, but the declaration and exhibit say February 12, 2014. Appx106, Appx109.

attempted to communicate with Mr. Jenkins or his mother about the location of the vehicles prior to the auction. *See* Appx126-29. Indeed, "[i]t is undisputed that the United States seized Jenkins' vehicles but did not notify Jenkins where the vehicles were held or when the holds on the vehicles were released." Appx09. Prior to the auction, only the impound lot operator attempted to send Mr. Jenkins' mother a notice that it was claiming the vehicles, but this notice was never received. Appx18-19. And as the United States admitted, and the magistrate found, the United States never initiated any forfeiture proceeding to permanently dispossess Mr. Jenkins or his mother of the vehicles. Appx70, Appx18; *see also* U.S. Dep't of Just., Asset Forfeiture Policy Manual, at 14-15 (2021) ("[O]nce [a decision is made to not proceed with judicial forfeiture] and the federal government no longer has a legal basis for holding the seized property (*i.e.* it is not evidence of a violation of law), the agency that seized the property must return it to the appropriate party, initiate abandonment proceedings pursuant to 28 C.F.R. § 8.10(e), or otherwise dispose of it in accordance with law)."); U.S. Dep't of Just., Asset Forfeiture Policy Manual, at 27 (2013) (same).

### C. Mr. Jenkins' Unsuccessful Fed. R. Crim. P. 41(g) Motion to Recover His Property

After his sentencing, Mr. Jenkins, "proceeding pro se, moved for return of property seized in connection with the criminal case, and the United States responded that it would return certain property, including the two vehicles." Appx04, Appx17. "In light of the United States' response, the court found Jenkins' motions moot." Appx17.

At the request of the United States Attorney's Office, the United States then inquired about the vehicles and determined that "the vehicles had been sold by [the] impound lot." Appx17. Mr. Jenkins moved for reconsideration, and "in the event the United States was unable to locate his property, he requested monetary compensation." Appx17. After learning the vehicles had been sold by an impound lot, Mr. Jenkins filed a settlement proposal, styled as a motion, with the court overseeing his criminal case. Appx17. The court denied Mr. Jenkins' motion, concluding that, "because [Mr.] Jenkins' claim was, at that time, for an amount in excess of $10,000," it should be adjudicated in the Court of Federal Claims under the Tucker Act. Appx17-18.

### D. Procedural History of this Civil Suit

Mr. Jenkins commenced this civil action in the District of North Dakota, alleging violations of the Takings Clause and Due Process Clause. Appx39-40. Under the Little Tucker Act, he sought damages or just compensation of less than $10,000 for the economic loss related to the physical appropriation and sale of his two vehicles. Appx18, Appx42, Appx56-57. Given the undisputed facts surrounding the seizure and the auction of the vehicles, Mr. Jenkins requested an "evidentiary hearing to determine the amount of compensation to be awarded to [him] based on the uncompensated taking of his vehicles by the United States at the time the vehicles were seized and ultimately sold." Appx57. The case was assigned to a magistrate judge.

The United States answered, generally denying the allegations. It did not, however, deny that the federal government officials acted in their sovereign capacity, and it did not assert *ultra vires* or tortious action on the part of individual federal officers as a defense. *See* Appx70, Appx74; *see, e.g.*, *Froudi v. United States*, 22 Cl. Ct. 290, 300-01 (1991) ("the averment that the government officials were not authorized to act as they did is an affirmative defense" to a takings

claim). In fact, the United States denied that Mr. Jenkins' injuries were caused by any tortious or negligent conduct by "the United States, its agents, or employees." Appx75. The United States then moved to dismiss for lack of jurisdiction, arguing that sovereign immunity barred Mr. Jenkins' claims. Appx88.

The magistrate refused to dismiss the takings claim after concluding that Mr. Jenkins had standing and that the Little Tucker Act waived sovereign immunity. Appx12, Appx15. The magistrate concluded that Mr. Jenkins had suffered a government "invasion of a legally protected interest," Appx06, based on the finding that Mr. Jenkins had "established by a preponderance of the evidence that he had an ownership interest in both vehicles," Appx08.[2] The magistrate further found that Mr. Jenkins had "demonstrated, by a preponderance of the evidence, a causal connection between his loss of the vehicles and

---

[2] Mr. Jenkins functioned as the recognized owner of the property under state law. Appx119. Mr. Jenkins declared that he purchased one vehicle for $5,000 and the other for $6,500 from private sellers. Appx126. He then transferred title for both vehicles to his mother. Appx126. Although Mr. Jenkins' mother became the registered title holder, Mr. Jenkins remained the actual owner and retained exclusive and sole use of the vehicles. Appx116, Appx126, Appx128. The United States did not contest Mr. Jenkins' ownership of the vehicles on summary judgment.

the United States' conduct" because "the United States seized Jenkins' vehicles but did not notify Jenkins where the vehicles were held or when the holds on the vehicles were released." Appx09.

The magistrate nevertheless dismissed the due-process claim on sovereign immunity grounds. Appx15. The magistrate reasoned that the Little Tucker Act's waiver could only apply to a due-process claim if the Due Process Clause was "money-mandating." Appx14; *cf. infra* Part II.[3] Based on this assumption, the magistrate concluded that sovereign immunity barred Mr. Jenkins' due-process claim. Appx14-15.

In light of these holdings, the United States filed a motion for judgment on the pleadings, or, in the alternative, a motion for summary judgment on the takings claim. Appx151. In that motion, the United States conceded that Mr. Jenkins had a "property interest" in the

[3] Mr. Jenkins cited money-mandating precedent in his pro-se complaint, but he also cited precedent discussing illegal exaction jurisprudence. Because he identified the Little Tucker Act as an applicable waiver, the lower court had, and this Court has, an independent duty to evaluate whether "his claim may qualify as one of illegal exaction." *Bowman v. United States*, 35 Fed. Cl. 397, 400 (1996); *see also Ford Motor Co. v. United States*, 635 F.3d 550, 556 (Fed. Cir. 2011) ("As the Supreme Court has stated . . . issues implicating subject matter jurisdiction 'can never be forfeited or waived.'") (citation omitted).

vehicles. Appx158. The United States, however, argued that its "taking pursuant to the government's police power" did not violate the Takings Clause "because it [was] not an exercise of the government's eminent domain power," Appx155-56.

Mr. Jenkins responded that physical takings or appropriations categorically require just compensation. Appx165-66. And while limited precedent suggested the federal government could initially seize and retain the vehicles "in connection with a criminal investigation," Appx165, he argued that the United States effected a taking "when [it] never returned the property and allowed it to be sold at auction," even though the vehicles were never forfeited under federal law "in relation to his federal criminal case," Appx165-66.

The United States nevertheless maintained that any "'taking' pursuant to [a] police power" cannot be a "cognizable taking for which [Mr. Jenkins] is entitled to compensation." Appx173. And while acknowledging that the federal government relinquished custody of the vehicles without returning them to Mr. Jenkins or giving him notice, the United States suggested that any arguments "related to the failure to provide notice that the vehicles were released or failure to provide

notice of the sale, must fall under a Fifth Amendment procedural due process argument, to which [the magistrate] determined there is no jurisdiction." Appx170-71.

The magistrate granted the United States' summary judgment on the takings claim. Relying on the limited factual record developed at the motion-to-dismiss stage, the magistrate concluded that "[t]he Fifth Amendment takings clause does not encompass a claim for just compensation for property seized under governmental police power." Appx23. To reach this holding, the magistrate relied only on cases where courts have concluded that "a compensable taking does not occur when property is seized pursuant to a valid search warrant and returned after conclusion of a criminal investigation." Appx22. And although the magistrate acknowledged that the result was "seemingly inequitable," it concluded that any limits on the federal government's actions were "largely imposed by the Due Process Clause." Appx23.

The court entered final judgment on November 2, 2021, and Mr. Jenkins timely appealed to the U.S. Court of Appeals for the Eighth Circuit on November 29, 2021. *See* Appx25, Appx183. On January 12, 2022, the Eighth Circuit transferred the appeal to this Court. Appx184.

## SUMMARY OF ARGUMENT

**I.** The Takings Clause categorically requires just compensation when the federal government physically appropriates personal property. There is no police-power exception that excuses that duty here. At most, this Court has recognized a limited police-power exception condoning the temporary seizure of property during ongoing criminal investigations (before the federal government has to return the property or pursue forfeiture proceedings). But neither this Court—nor the Supreme Court—has ever held that this limited police-power exception displaces the federal government's categorical just-compensation obligation when the investigation ends and no forfeiture proceeding begins. The magistrate erred in concluding otherwise. This Court cannot affirm without creating a new exception that directly contradicts the plain text of the Constitution, as well as binding precedent. The only thing left to do here is remand to determine the amount of just compensation owed in light of the federal government's taking.

**II.** Alternatively, as the magistrate and United States recognized, if Mr. Jenkins did not state a takings claim, then his claims had to

sound in due process. The Little Tucker Act waives sovereign immunity for due-process claims seeking to recover from the United States for property illegally or improperly exacted. That waiver applies regardless of whether the Due Process Clause is money mandating. Accordingly, the magistrate's jurisdictional dismissal of the due-process claim cannot stand.

## STANDARD OF REVIEW

Federal Circuit precedent applies to issues unique to the Little Tucker Act's grant of exclusive appellate jurisdiction. *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1343 (Fed. Cir. 2011); *Atari, Inc. v. JS & A Grp., Inc.*, 747 F.2d 1422, 1439 (Fed. Cir. 1984). Otherwise, the law of the originating regional circuit governs. *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1303 (Fed. Cir. 2015).

Whether there is a waiver of sovereign immunity is a jurisdictional issue that receives "plenary review on appeal." *Aerolineas Argentinas*, 77 F.3d at 1572. At the jurisdictional dismissal stage, "the allegations stated in the complaint are taken as true and jurisdiction is decided on the face of the pleadings." *Id.*; *Titus v. Sullivan*, 4 F.3d 590,

593 (8th Cir. 1993). Where limited jurisdictional factfinding is appropriate, underlying "findings of disputed jurisdictional facts" are reviewed for "clear error," and the ultimate determination of law regarding immunity is reviewed de novo. *BP Chems. Ltd. v. Jiangsu SOPO Corp.*, 420 F.3d 810, 817 (8th Cir. 2005); *Ins. Co. of W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988).

A grant of summary judgment is reviewed de novo. *Metro. Prop. & Cas. Ins. Co. v. Calvin*, 802 F.3d 933, 937 (8th Cir. 2015); *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1303 (Fed. Cir. 2015). Summary judgment cannot be affirmed where other findings are necessary, or it is "beneficial" for the lower court to consider "alternative argument[s] in the first instance." *Metro. Prop. & Cas. Ins. Co.*, 802 F.3d at 939.

## ARGUMENT

The Fifth Amendment's Takings Clause requires the payment of just compensation when the federal government physically appropriates personal property and does not return it. Alternatively, where the government improperly exacts property in contravention of due process

(*e.g.*, without providing basic notice about the property's disposition), the Due Process Clause provides a separate avenue to relief. The contested action here was either a taking or an illegal exaction. *See Aerolineas Argentinas*, 77 F.3d at 1578 n.3 (describing illegal-exaction claims and taking claims as "alternative" theories of jurisdiction). Either way, the Fifth Amendment provides Mr. Jenkins his requested relief.

## I. PHYSICAL APPROPRIATIONS CATEGORICALLY REQUIRE JUST COMPENSATION

"When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery*, 141 S. Ct. at 2071; U.S. Const. amend. V. The Little Tucker Act entitles a claimant to pursue a Fifth Amendment takings claim for just compensation against the United States when the government takes property without paying for it. 28 U.S.C. § 1346(a)(2); U.S. Const. amend. V; *United States v. Clarke*, 445 U.S. 253, 256-57 (1980).

This Court applies a two-part test to determine "whether governmental action constitutes a taking." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1348 (Fed. Cir. 2013). "First, the court

determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking." *Id.* "Second, if the court concludes that a cognizable property interest exists, it determines whether the government's action amounted to a compensable taking of that interest." *Id.*

Here, only the second step is at issue. The magistrate correctly found that "Jenkins has established by a preponderance of the evidence that he had an ownership interest in both [seized] vehicles." Appx08. But in evaluating whether the federal government's action amounted to a compensable taking, the magistrate reversibly erred. The magistrate drew a false dichotomy between private property seized under a police power and private property taken for public use. Appx16. A compensable taking occurred because the United States physically appropriated Mr. Jenkins' personal property without compensation. There is no police-power exception that excuses the federal government from paying just compensation here.

### A. The United States Owes Just Compensation for Physically Appropriating Mr. Jenkins' Personal Property

#### 1. *Per se* physical appropriations trigger just compensation

A "taking" of private property may occur by the government's physical appropriation of property or by regulation. When the government physically appropriates or occupies property—as here—the fact that a taking has occurred "is typically obvious and undisputed." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 n.17 (2002). "[P]hysical appropriations constitute the 'clearest sort of taking,'" and a court must "assess them using a simple, *per se* rule: The government must pay for what it takes." *Cedar Point Nursery*, 141 S. Ct. at 2071.

While a physical appropriation can occur through eminent domain, it also occurs when "the government" "occupies property" or "physically takes possession of property without acquiring title to it." *Id.*; *see also Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983) (explaining that "the Fifth Amendment requirement for payment of just compensation is equally applicable to government action otherwise labeled but having the effect of" a formal

condemnation). Indeed, physical appropriations routinely occur without a formal title transfer. That is why "the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking." *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945). And why "[g]overnmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking." *Id.*; *Murray v. United States*, 817 F.2d 1580, 1583-84 (Fed. Cir. 1987); *see also R. J. Widen Co. v. United States*, 357 F.2d 988, 993 (Ct. Cl. 1966) ("The decisive factor in each of these cases, and in the others which follow the same principle, is that the personal property or other rights had been directly appropriated or destroyed by actions of agents or officials of the government.").

Moreover, the *per se* physical appropriation rule applies whether the government appropriates "private property for itself or a third party." *Cedar Point Nursery*, 141 S. Ct. at 2071. And the government cannot "avoid the categorical duty to pay just compensation for a physical taking of property by reserving to the property owner a

contingent interest in a portion of the value of the property." *Horne v. Dep't of Agric.*, 576 U.S. 350, 362-63 (2015).

Finally, when a court evaluates physical appropriations there is no reason to engage in ad hoc factual inquiries applicable to regulatory takings. *Cf. Kaiser Aetna v. United States*, 444 U.S. 164, 175, 178-79 (1979) (setting forth one version of regulatory takings analysis); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 129-31 (1978). The Supreme Court's "jurisprudence involving . . . physical takings is as old as the Republic and, for the most part, involves the straightforward application of *per se* rules." *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 322.

**2. The just-compensation duty is categorical**

"Once the government's actions have worked a taking of property, 'no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.'" *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 33 (2012) (quoting *First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty., Cal.*, 482 U.S. 304, 321 (1987)). That remains true "no matter what sort of procedures the government puts in place to

remedy a taking." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2170-71 (2019). "[A] property owner has a Fifth Amendment entitlement to compensation as soon as the government takes his property without paying for it. Whether the government does nothing, forcing the owner to bring a takings suit under the Tucker Act, or whether it provides the owner with a statutory compensation remedy." *Id.*

#### 3. These foundational takings rules require just compensation here

The Supreme Court's decision in *Horne v. Department of Agriculture*, 576 U.S. 350 (2015), illustrates these foundational principles of takings jurisprudence. In *Horne*, the federal government, pursuant to its Commerce Clause power, administered a program mandating that raisin growers turn over a percentage of their crop annually. Under the program, the federal government had the discretion to destroy the property or to take possession of and transfer the property to third parties. *Id.* at 355. Faced with a challenge to the program, the United States asserted that it had the authority to seize and disburse the property as part of "general regulatory activity" and that this authority somehow excused it from providing "just compensation for a specific physical taking." *Id.* at 368.

The Supreme Court rejected the federal government's theory. It explained that a Fifth Amendment taking occurred upon the federal government's "actual taking of possession and control" even if the owners retained the right to "residual proceeds" following subsequent government action. *Id.* at 362. Indeed, the Supreme Court held that the government has a "categorical duty" to compensate when it takes possession of an interest in personal property even if it could seize the property initially and delay compensation until later. *Id.* at 357. The "character of the government action" or the "claimed public benefit" were irrelevant to whether a *per se* physical taking occurred. *Id.* at 359-60; *see also id.* at 360 (referencing well-established precedent that "a physical *appropriation* of property [gives] rise to a *per se* taking, without regard to other factors").

Here, as in *Horne*, there is no doubt that the federal government physically took Mr. Jenkins' property. Neither the magistrate nor the United States disputed that Mr. Jenkins' property was physically appropriated and that the United States did not return it or pursue forfeiture proceedings. When there is a physical appropriation, a *per se* taking has occurred and just compensation is owed. That is the

beginning and end of the inquiry. Because the federal government effected a compensable taking of Mr. Jenkins' property, determining just compensation owed is the only task left on remand.

### B. No "Police-Power" Exception Allows the Federal Government to Avoid Just Compensation When It Physically Appropriates Property and Does Not Return It

After recognizing that the federal government took Mr. Jenkins' property, the magistrate failed to undertake the straightforward analysis that is appropriate here. *See supra* Part I.A. It instead accepted the United States' invitation to hold that the initial exercise of a police power excused the federal government's permanent dispossession. Appx20-23. But no "police power exception" allows the United States to permanently dispossess someone of property outside of forfeiture proceedings.

Below, the United States puzzlingly argued that unless the federal government exercises its "eminent domain" power, "a taking pursuant to the government's police power is not a violation of the Takings Clause." Appx155-56. And the United States went so far to suggest that its initial exercise of any "police power," besides eminent domain, meant that a taking could not be for a "public use." Appx155. In

granting summary judgment for the United States, the magistrate accepted the United States' unprecedented gloss on the expansiveness of an alleged "police power exception," concluding that "[t]he Fifth Amendment takings clause does not encompass a claim for just compensation for property seized under governmental police power." Appx23.

The magistrate reversibly erred. There is no "police power" escape hatch for a federal action that deprives a property owner of all rights in lawfully acquired property outside of federal forfeiture proceedings. *See Horne*, 576 U.S. at 360; *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1026 (1992) (explaining that recitation of a police power "justification cannot be the basis for departing from [the Supreme Court's] categorical rule that total regulatory takings must be compensated"). *At most*, the limited precedent relied on by the magistrate and United States below can be construed to allow the government to *temporarily* seize property for a criminal or a forfeiture proceeding *and then* return it or lawfully acquire it.[4] But both the

[4] While there are "criminal forfeiture" proceedings, this brief uses the shorthand "criminal" proceeding to refer to criminal investigations

Supreme Court's and this Court's precedent is clear that invocation of a "police power" cannot categorically end a takings analysis.

#### 1. Limited precedent allowing the federal government to temporarily hold property prior to the conclusion of a criminal or forfeiture proceeding does not apply here

Here, the magistrate and the United States cited a few decisions that have rejected takings claims based on *temporary* possession of property (A) after an initial seizure and (B) before return of the property to the claimant following the conclusion of a criminal or forfeiture proceeding. These decisions have not coalesced around a single theory as to why a takings claim cannot proceed under these circumstances. And neither the magistrate nor the United States cited a case where such an exception applies where the federal government permanently, physically appropriated property by turning it over to another party outside the context of forfeiture proceedings.

Some courts have concluded that a takings claim under the Tucker Act is not ripe until the plaintiff files a motion for return of property pursuant to Fed. R. Crim. P. 41(g). *See, e.g.*, *Carter v. United*

---

and trials against a person, and "forfeiture" proceeding to refer to the range of proceedings against property.

*States*, 62 Fed. Cl. 365, 369 (2004) ("A party may have a valid takings claim in the event his property was seized by the Government as part of a criminal investigation and never forfeited or returned; however, this claim for just compensation is not ripe until the aggrieved party has availed himself of the procedures set forth in Rule 41(g) and obtained a final decision from the district court that entitles him to assert a takings claim."); *Garcia Carranza v. United States*, 67 Fed. Cl. 106, 111 (2005) (same); *cf. Knick*, 139 S. Ct. at 2178.

Other courts have concluded that there is no compensation owed for the time the government temporarily possesses property between seizure and return to the claimant. *See, e.g.*, *United States v. One (1) 1979 Cadillac Coupe De Ville VIN 6D4799266999*, 833 F.2d 994, 1000 (Fed. Cir. 1987) ("The government's possession of the vehicle between the seizure and the jury verdict was not a taking of the vehicle for which Baker was entitled to just compensation.").

Yet other cases remark that no "public use" crystallizes when a police force temporarily seizes property pursuant to an investigation or forfeiture proceedings. *See, e.g.*, *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1332 (Fed. Cir. 2006) (concluding that, during the course of

an investigation "items properly seized by the government under its police power are not seized for 'public use' within the meaning of the Fifth Amendment").

And still others blend various inquiries to conclude that a takings claim fails when it is based on "[p]roperty seized and retained pursuant to the police power" that is later returned to the claimant. *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153-54 (Fed. Cir. 2008) (concluding both that seizing and retaining property is not for a "public use" and "did not result in a compensable taking" where the federal government returned the property).

But in every case cited by the magistrate and the United States, the federal government either:

**(1)** still had the challenged property in its possession pending conclusion of criminal or forfeiture proceedings;

**(2)** had returned the property to the claimant after the trial or failed forfeiture proceedings; or

**(3)** had lawfully acquired the property through federal forfeiture proceedings.[5]

These cases do not extend to permanent deprivations of property interests simply because an initial confiscation began as a law enforcement operation. At most, they allow for a temporary deprivation in direct furtherance of law enforcement functions.

---

[5] The lone, potential exception appears to be *Steward v. United States*, 80 Fed. Cl. 540 (2008). In that nonbinding case, however, the complaint and record were unclear about whether a forfeiture proceeding occurred, *id.* at 541, and "the exact fate of [the plaintiff's] property [could not] be ascertained," *id.* at 544. In fact, the United States argued that the plaintiff should have pursued a 41(g) motion to "prove that property to which he is entitled has not been returned to him." *Id.* Here, by contrast, it is clear from Mr. Jenkins' complaint that the United States took his property and did not return it. Mr. Jenkins also already pursued a 41(g) proceeding and diligently inquired about his property both before and after that proceeding.

Put simply, *no precedent* recognizes an exception to the Takings Clause where the federal government permanently physically appropriates property by turning it over to another party outside the context of forfeiture proceedings. And such a new exception cannot coexist with our constitutional framework.

#### 2. Invocation of a "police power" does not end takings analysis

As explained in Section I.A, *supra*, when the federal government physically appropriates someone's property, it has to pay for it, regardless of whether it took said property while exercising a "police power." Beyond the fact that no court has blessed the aggressive argument championed by the United States below, talismanic invocation of "police power" cannot constitutionally shut off all takings analysis against the federal government for at least three additional reasons.

*First*, the exercise of a police power actually *demonstrates* that the government is acting in pursuit of the "public use" clause. *Second*, breaking new ground and holding that an initial invocation of "police power" shields government action from takings analysis would short circuit all controlling takings analysis established by over a century of

precedent (both *per se* and regulatory takings). *Third*, the *federal* government has no traditional "police powers." Thus, it would be nonsensical to create a new federal "police power" exception to immunize the federal government from its categorical obligation to pay just compensation when it physically appropriates personal property.

This Court must recognize the limited federal "police power" precedent cited by the United States for what it is: a small exception holding that a *temporary* seizure for a law enforcement purpose does not give rise to a takings claim. But an exception for temporary deprivations of property in direct furtherance of law-enforcement functions does not excuse the permanent deprivation of property that occurred here.

**i.** The "public use" clause is a limitation on government action—albeit a narrow one—but the government cannot weaponize it to avoid paying just compensation. "The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar [the] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*,

364 U.S. 40, 49 (1960). Adopting the United States' contrary construction "would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right." *Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. 166, 177-78 (1871) (construing a provision in the Wisconsin Constitution "almost identical" to the Fifth Amendment's Taking Clause); *see also First Eng.*, 482 U.S. at 314-22.

Exercises of a "police power" undeniably fit within the Supreme Court's definition of "public use." "The 'public use' requirement is thus coterminous with the scope of a sovereign's police powers." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984). In fact, the Supreme Court has construed the "public use" clause to mean anything the government does in support of a broad "public purpose"—even if the government ultimately hands over the property to private third parties. *Kelo v. City of New London*, 545 U.S. 469, 483-84 (2005).

In *Kelo*, for example, the petitioners argued that the local government's authority to transfer their private property to a private developer did not meet the Fifth Amendment's "public use"

requirement. *Id.* at 472. But the Supreme Court explained that, to achieve a "public purpose" the government is free to take property from one private party and confer it to another private party as part of a government action. *Id.* at 477. The government need not retain the property itself so long as the initial seizure or dispossession related to some "public purpose." *Id.* at 480; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 992-93, 1014 (1984) (rejecting the argument that there is no "public use" where the federal government turns over property to another private party and leaves it to the parties to negotiate compensation prior to a Tucker Act suit).

Moreover, the "Takings Clause presupposes that the government has acted in pursuit of a valid public purpose." *See, e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005); *Kelo*, 545 U.S. at 485 (surveying broad interpretations of the public use clause). As an "affirmative defense," the government can argue that federal officials "were not authorized to act as they did." *Froudi*, 22 Cl. Ct. at 300-01; *see also Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 899 (Fed. Cir. 1986). But absent an admission that a rogue federal official took *ultra vires* action, or an admission that an exercise of the police power

violated due-process protections, exercises of a police power *are* public use. *See Midkiff*, 467 U.S. at 240; *Chi., Rock Island & Pac. Ry. Co. v. United States*, 284 U.S. 80, 96-97 (1931).

Because the exercise of police power is a public use, the United States' suggestion and magistrate's conclusion that the two concepts are mutually exclusive cannot stand. The supposed "police power exception" does not displace governing Supreme Court public use precedent. It is—at most—a limited exception for temporary, custodial seizures specifically for law enforcement purposes.

**ii.** In addition, concluding that an initial exercise of a "police power" absolves the government from paying just compensation would upend the foundation for all takings jurisprudence. A taking occurs *because* the government's exercise of a police power goes too far.

For instance, in the quintessential *per se* takings case, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), the Supreme Court held that a compensable taking occurred when the government "authorized" a "minor but permanent physical occupation of an owner's property." *Id.* at 421. The lower court had disregarded this straightforward application of takings law because it concluded that the

challenged government action "serve[d] a legitimate police power purpose." *Id.* at 425.

The Supreme Court reversed. It held that the initial exercise of a police power could not derail the takings analysis because its cases "uniformly have found a taking to the extent of the [physical] occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 434-35. As a result, whether a governmental action falls within a "police power" does not by itself determine whether "compensation must be paid." *Id.* at 425.

As for regulatory takings, as Justice Holmes explained almost one hundred years ago, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). Indeed, "[t]he Supreme Court's entire 'regulatory takings' law is premised on the notion that a [government actor's] exercise of its police powers can go too far, and if it does, there has been a taking." *John Corp. v. City of Houston*, 214 F.3d 573, 578 (5th Cir. 2000); *see also Baker v. City of McKinney*, No. 21-CV-00176, 2021 WL 5390550, at *7 (E.D. Tex. Nov. 18, 2021) (rejecting the

government's request to "adopt what would constitute a per se rule—that destruction to private property resulting from the exercise of valid police power cannot constitute a Fifth Amendment Taking"). This is because the Takings Clause prevents "the uses of private property" from being subjected "to unbridled, uncompensated qualification under the police power." *Lucas*, 505 U.S. at 1014. And that is why the Supreme Court treats police-power regulation depriving an owner of "all economically beneficial uses" of his property the same as physical appropriations. *Id.* at 1018, 1028-31. In short, whether a taking occurred is "an entirely separate question" from whether the federal government initially had power to execute its chosen regulatory action. *Kaiser Aetna*, 444 U.S. at 174.

Relatedly, even if Mr. Jenkins' claim was (erroneously) analyzed under a regulatory-taking analysis, the result would be the same. Completely dispossessing Mr. Jenkins of his property deprives him of all economically viable use, and the invocation of a "police power" exception does not alter the United States' takings liability here. Under either takings theory, if the government's exercise of police power extends too far, then a compensable taking has occurred.

**iii.** There is no constitutional basis for inventing a new, broadly construed *federal* police-power exception to the Takings Clause. "[T]he Constitution creates a Federal Government of enumerated powers." *United States v. Lopez*, 514 U.S. 549, 552 (1995). Unlike the states, the federal government does not have some residual, amorphous "police power." *See* U.S. Const. amends. IX-X; U.S. Const. art. I, § 8. "[T]he Founders denied the National Government" any general "police power." *United States v. Morrison*, 529 U.S. 598, 618 (2000); *Lopez*, 514 U.S. at 566 (same). Thus, any "'police power' rationale, where the federal government is concerned, must be considered within the context of constitutional authorization of particular powers." *McCutchen v. United States*, 14 F.4th 1355, 1363 n.4 (Fed. Cir. 2021) (citing cases).

Consequently, whatever questionable basis exists for limitations on property rights under background principles of a *state's* police power, they do not inhere in a nonexistent *federal* police power. *See PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 84 (1980) (explaining that the federal government lacks any "residual authority [possessed by the states] that enables it to define 'property' in the first instance"); *cf. Lucas*, 505 U.S. at 1029 (explaining that *even states* cannot rely on their

police powers to evade just compensation when they effect a physical appropriation because any property limitation of that degree must "inhere in the title itself" and stem from the "background principles of the State's law of property and nuisance"); U.S. Const. amend. IX.

Thus, any unprecedented extension of the police-power exception in the federal context must find a home in an enumerated and established federal power. The United States cannot point to any legitimate federal power here.

Even assuming there is any constitutionally justifiable basis to exclude some exercises of a federal "police power" from takings analysis—and Mr. Jenkins preserves the argument that there is no basis to do so—any exception may only rest on a narrow historical carve-out for *temporary* intrusions or deprivations in direct furtherance of certain law enforcement functions. *See, e.g.*, *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1378 (Fed. Cir. 2013). For example, courts have allowed limited intrusions onto property to abate a nuisance, "effect an arrest[,] or enforce the criminal law under certain circumstances." *Cedar Point Nursery*, 141 S. Ct. at 2079. But these are very limited exceptions where the government needs to point to a

historical "defense" or privilege and stay within the confines of that defense or privilege. *TrinCo Inv. Co.*, 722 F.3d at 1380; *id.* at 1378-80 (concluding that there was no historical necessity defense to "absolve the Government of a duty to compensate a party for lost property" for destruction of acres of timber in furtherance of fire management efforts); *Cedar Point Nursery*, 141 S. Ct. at 2079.

The most that can be said for the federal government's "police power" here—under any precedent—is that the federal government has a limited right to *temporarily* seize property for use in investigations and trial if it has probable cause to believe the property is evidence of unlawful activity. *Warden v. Hayden*, 387 U.S. 294, 306-07 & n.11 (1967). And it has similar, limited powers to *temporarily* hold property before it pursues forfeiture proceedings. *See, e.g.*, *United States v. U.S. Coin & Currency*, 401 U.S. 715, 718 (1971); *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 564 (1983). But the federal government may not effect a *de facto* forfeiture of the property by holding it for an unreasonable period of time or by turning the property over to another party. *See, e.g.*, *United States v. Premises Known as 608 Taylor Ave.*,

*Apartment 302, Pittsburgh, Pa.*, 584 F.2d 1297, 1302 (3d Cir. 1978); *United States v. Wilson*, 540 F.2d 1100, 1104 (D.C. Cir. 1976) ("It goes without saying, that if the Government seeks to forfeit the property a proper proceeding should be instigated to accomplish that purpose.").

Without the protection of limited precedent allowing the temporary retention of evidence pursuant to a federal investigative power or a federal forfeiture purpose, the federal government's physical appropriation clearly constitutes a compensable taking. *See supra* Part I.A; *cf.* 28 U.S.C. § 2465(a)(1) (commanding that temporarily seized property "shall be returned forthwith to the claimant or his agent" following "entry of a judgment for the claimant" in forfeiture proceedings). Once the federal government altered its possessory interest—transforming its initial custodial action based on a limited, temporary "police power" into a physical dispossession—it had only two options: turn the property back over to its owners or pay just compensation. *See Knick*, 139 S. Ct. at 2176-77 (noting that "the compensation remedy is required by the Takings Clause itself"). That is the only way to reconcile limited, police-power precedent with the broader, controlling body of takings law and the Constitution. *See, e.g.*,

*Cedar Point Nursery*, 141 S. Ct. at 2079 (allowing only limited exceptions for temporary physical invasions "consistent with longstanding background restrictions on property rights"); *Ark. Game & Fish Comm'n*, 568 U.S. at 40 n.2 (explaining that a theoretical ability to reclaim property later "does not disqualify a [property owner] from receipt of just compensation for a taking"). Otherwise, "the police power would swallow private property whole." *Patty v. United States*, 136 Fed. Cl. 211, 215 (2018) (rejecting the United States' argument that police-power precedent excuses it from paying just compensation arising from damage to a truck sustained when the DEA used it during a controlled drug delivery without the owner's permission). To the extent this Court interprets any police-power precedent to foreclose Mr. Jenkins' takings claim, Mr. Jenkins preserves the argument that it should be reconsidered en banc or overruled by the Supreme Court.

Put simply, none of the cases cited by the magistrate or the United States in this case preclude Mr. Jenkins' claim or justify a departure from a full takings analysis. The federal government's limited authority to custodially hold property prior to conclusion of a criminal or forfeiture proceeding is the only conceivable reason to temporarily

delay a just-compensation suit. *See also Bailey*, 700 F.3d at 1153 ("[T]he United States is responsible for property that is considered as evidence in a federal trial even if it is in the actual possession of state officials."). And any reason to delay Mr. Jenkins' request for just compensation has long since evaporated.

* * *

In short, the Constitution prescribes the remedy for exercises of federal government power that produce a taking: just compensation. Postulating a police power is no panacea.

## II. THE LITTLE TUCKER ACT WAIVES SOVEREIGN IMMUNITY FOR MR. JENKINS' DUE-PROCESS CLAIM

The magistrate also reversibly erred by dismissing Mr. Jenkins' alternative due-process claim. It did so solely on the basis that the Due Process Clause is not money mandating. But Mr. Jenkins' due-process claim is an illegal-exaction claim, and therefore, the Little Tucker Act waives the United States' sovereign immunity here regardless of whether the Due Process Clause is money mandating.

The Tucker Act and Little Tucker Act "waive sovereign immunity" for at least three separate categories of actions against the United States: "[1] actions pursuant to contracts with the United States,

[2] actions to recover illegal exactions of money by the United States, *and* [3] actions brought pursuant to money-mandating constitutional provisions, statutes, regulations, or executive orders." *Martinez v. United States*, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003) (en banc) (emphasis added); *Aerolineas Argentinas*, 77 F.3d at 1573-74; *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007-08 (Ct. Cl. 1967). Mr. Jenkins' due-process claim is an illegal-exaction claim—one against the United States alleging that the federal government improperly exacted his property—not a money-mandating claim. *See* 28 U.S.C. § 1346(a)(2); *Aerolineas Argentinas*, 77 F.3d at 1572-73. Therefore, there is no requirement that Mr. Jenkins' due-process claim be based on a money-mandating source of law. *See Boeing Co. v. United States*, 968 F.3d 1371, 1384 (Fed. Cir. 2020) ("[The Federal Circuit has] assumed jurisdiction over statutory illegal exaction claims with no regard for whether the statutes were 'money-mandating.'").

An illegal-exaction claim is a non-tortious, non-contractual claim for money damages against the United States. *See, e.g.*, *Reid v. United States*, 148 Fed. Cl. 503, 524 (2020) (noting that "plaintiffs plead the predicates for takings and illegal-exaction claims by alleging, in

essence, that they were forced to give their property to the government because of lawful or unlawful government conduct"), *amended*, 149 Fed. Cl. 328 (2020). Under this Court's "illegal exaction" jurisprudence, a claim for damages against the United States can be maintained if money was improperly paid, exacted, or taken from a claimant, and that exaction was in violation of the Constitution (including the Due Process Clause), a statute, or a regulation. *See Aerolineas Argentinas*, 77 F.3d at 1572-73; *see also Mallow v. United States*, 161 Ct. Cl. 446, 449-50 (1963) (granting judgment on the pleadings for the plaintiff who had alleged a Due Process Clause violation where the government had "illegally collected" fines from the plaintiff). Here, the government exacted Mr. Jenkins' property from him in violation of the Due Process Clause and a host of other statutes and regulations.

Thus, the Little Tucker Act waives sovereign immunity because (A) Mr. Jenkins' due-process claim triggered the illegal exaction waiver and (B) there is no requirement within the illegal exaction waiver that the claim be based on a money-mandating source of law.

### A. The Little Tucker Act Waives Sovereign Immunity for Mr. Jenkins' Claim that the United States Illegally Exacted His Property Without Due Process

At the jurisdictional dismissal stage, "[a]llegations of subject matter jurisdiction . . . must satisfy a relatively low standard" only exceeding "a threshold that 'has been equated with such concepts as "essentially fictitious," "wholly insubstantial," "obviously frivolous," and "obviously without merit."' *Boeing Co.*, 968 F.3d at 1383 (citations omitted). "Thus, to establish Tucker Act jurisdiction for an illegal exaction claim," a party that has turned money or property over to the federal government need only "make a non-frivolous allegation that the government, in obtaining the money [or property], has violated the Constitution, a statute, or a regulation." *Id.*; *Aerolineas Argentinas*, 77 F.3d at 1572; *Titus*, 4 F.3d at 593. Here, Mr. Jenkins' due-process claim more than sufficed at the jurisdictional dismissal stage to trigger the Little Tucker Act's waiver of sovereign immunity because he alleged that his property was illegally or improperly appropriated in contravention of constitutionally required due-process protections. *See, e.g.*, *Boeing Co.*, 968 F.3d at 1383; *see also Aerolineas Argentinas*, 77 F.3d at 1573 (concluding that an illegal exaction occurred where the

federal government required airlines to bear custodial costs for which it was responsible).

The Supreme Court's "precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property," and this rule applies all the same to property initially seized pursuant to criminal or forfeiture proceedings. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) (holding that the Due Process Clause restricts the federal government's actions related to forfeiture proceedings). "The requirement of notice and an opportunity to be heard . . . works, by itself, to protect against arbitrary deprivation of property," because "when a person has an opportunity to speak up . . . and when the State must listen . . . substantively unfair and simply mistaken deprivations of property interests can be prevented." *Fuentes v. Shevin*, 407 U.S. 67, 81 (1972). Additionally, no federal statute, regulation, or even policy guidance allows the United States to refuse to return property—or turn

it over to a third party—if the property is not being temporarily held for a criminal or forfeiture proceeding.[6]

The magistrate's own limited factual findings supported an illegal-exaction waiver of sovereign immunity because the magistrate found that Mr. Jenkins had suffered an invasion of a "legally protected"

---

[6] *Cf.* Fed. R. Crim. P. 41 (limitations on federal search and seizure warrants and provision for a motion to return seized property); 18 U.S.C. § 3101 *et seq.* (limitations on federal search and seizure warrants, notice requirements, and return of property); 28 U.S.C. § 2465(a)(1) (commanding that temporarily seized property "shall be returned forthwith to the claimant or his agent" following "entry of a judgment for the claimant" in forfeiture proceedings); 18 U.S.C. §§ 981, 983 (rules for forfeiture proceedings and handling of property pre-forfeiture); 21 U.S.C. §§ 853, 881 (same); 28 C.F.R. § 8.10(e) ("[T]he seizing agency shall return the property or shall suspend the administrative forfeiture proceeding and promptly transmit the claim. . . . Upon making the determination that the seized property will be released, the agency shall promptly notify the person with a right to immediate possession of the property . . . ."); *see also* U.S. Dep't of Just., Asset Forfeiture Policy Manual, at 14-15 (2021) ("[O]nce [a decision is made to not proceed with judicial forfeiture] and the federal government no longer has a legal basis for holding the seized property (*i.e.* it is not evidence of a violation of law), the agency that seized the property must return it to the appropriate party, initiate abandonment proceedings pursuant to 28 C.F.R. § 8.10(e), or otherwise dispose of it in accordance with law)."); U.S. Dep't of Just., Asset Forfeiture Policy Manual, at 27 (2013) (same); *id.* at 56 (noting that under federal law "seized property does not indefinitely remain in the hands of the Government without the property owner having any opportunity to contest the forfeiture in a court of law. Thus, if the Government fails to send notice to the person from whom the property was seized within the statutory period for sending notice, it must return the property to that person").

property interest causally connected to the United States' conduct. Appx06, Appx08-09. Specifically, the magistrate found that Mr. Jenkins had established, by a preponderance of the evidence, a property interest in both vehicles, and "a causal connection between his loss of the vehicles and the United States' conduct." Appx08-09. And as the magistrate succinctly recognized, "[i]t is undisputed that the United States seized Jenkins' vehicles but did not notify Jenkins where the vehicles were held or when the holds on the vehicles were released." Appx09. That was more than enough at the jurisdictional stage to establish a waiver of sovereign immunity for his due-process claim. *See, e.g.*, *Aerolineas Argentinas*, 77 F.3d at 1572.

What is more, even when the United States moved for summary judgment there was nothing in the factual record contradicting Mr. Jenkins' jurisdictional showing or supporting jurisdictional dismissal of Mr. Jenkins' due-process claim. "There [was] no evidence the vehicles were forfeited to the United States." Appx18. The United States never introduced evidence of any notice or process it offered to

Mr. Jenkins or his mother (1) when the vehicles were initially impounded; (2) when they were "released"; or (3) when they were sold.[7]

In short, Mr. Jenkins and his mother—who were in federal custody—were deprived not just of *due* process, but were deprived of *any* process. And absent the magistrate's earlier dismissal for lack of jurisdiction, at the very least Mr. Jenkins' complaints about inadequate notice and process sounded in limits "imposed by the Due Process Clause." Appx23.

Indeed, the magistrate explicitly acknowledged this legal conclusion in granting summary judgment on the takings claim, Appx23, and the United States conceded the same in arguing for summary judgment, Appx172 (United States arguing that "Plaintiff is only left to due process arguments relating to allegations of improper or inadequate notification of the release and sale of the vehicles. These arguments must fail because this Court does not have jurisdiction"), Appx174 ("[A] challenge to a taking or a request for a return, or an

---

[7] Even the Minnesota statute that the United States referenced below—requiring "the unit of government or impound lot operator taking [an impounded vehicle] into custody" to "give written notice of the taking within five days," Minn. Stat. Ann. § 168B.06(a)—was not followed.

objection to a forfeiture would implicate a claimant's due process rights . . ."). Because Mr. Jenkins' due-process claim falls within the Little Tucker Act's waiver of sovereign immunity for illegal-exaction claims, this Court should reverse and remand.[8]

### B. There is No "Money Mandating" Requirement to a Claim Stating an Illegal Exaction

The magistrate dismissed Mr. Jenkins' due-process claim based on the erroneous belief that the Little Tucker Act contained no waiver of sovereign immunity if the Due Process Clause was not "money-mandating." Appx14. But binding precedent establishes that the money-mandating requirement is wholly inapplicable to illegal exactions. *Martinez*, 333 F.3d at 1302-03; *Aerolineas Argentinas*, 77

---

[8] Although not necessary to sustain the due-process claim, it bears reiterating that Mr. Jenkins tried to recover his property through available 41(g) procedures in the earlier criminal case, and the United States successfully opposed relief by arguing that "it would return certain property, including the two vehicles." Appx17. But when the United States learned it could not return Mr. Jenkins' property, it *still* opposed relief. Appx17-18; *cf. New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (explaining that normally parties are estopped from assuming contrary positions after they prevail on an earlier representation). Allowing the United States to avoid its custodial obligations under Federal Rule of Criminal Procedure 41 without reprisal would render any due-process constraints on its handling of evidence a nullity. *Cf. Bailey*, 700 F.3d at 1153.

F.3d at 1573-74; *Eastport S.S. Corp.*, 372 F.2d at 1007-08. In preserving multiple avenues to trigger the Tucker Act's and Little Tucker Act's waiver, both this Court and the Supreme Court have explained that the money-mandating requirement does not apply when the suit is based on property or "money improperly exacted or retained." *United States v. Testan*, 424 U.S. 392, 401 (1976); *Boeing Co.*, 968 F.3d at 1383.

The money-mandating requirement applies only when the plaintiff seeks to rely on a source of law that mandates payment from the federal government. For example, in a money-mandating case, a plaintiff might allege that he is owed money from the United States "based on a violation of a statutory obligation to pay." *Boeing Co.*, 968 F.3d at 1384 n.6.

On the other hand, an illegal exaction occurs when the United States has "demanded and taken" property "in violation of" a source of law. *Id.* at 1383. Or the United States has erroneously asserted that its interpretation of a source of law required turning over property or money to a third party. *Aerolineas Argentinas*, 77 F.3d at 1576. It follows that these sources of law would not necessarily mandate

payment back to a claimant because they did not authorize the federal government to take the money or property in the first place.

Put differently, a money-mandating source of law does not stop the United States from performing an action, it just triggers a payment obligation. But an illegal exaction occurs when the United States should not have demanded or kept the property or money, and the plaintiff wants to "recover" money, property, or the equivalent of all of part of the "sums exacted illegally by the [United States] due to its misinterpretation or misapplication" of the underlying source(s) of law. *Id.* at 1578; *see also Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996) ("Were an illegal exaction to be found, Plaintiff could receive the value of his forfeited property.").

As this Court has recognized, some cases have included off-hand statements blurring the line between illegal exactions and money-mandating cases (*e.g.*, the dicta in *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005)). But this Court's earlier decisions, together with en banc and Supreme Court precedent, control. As this Court explained in discussing *Norman*'s dicta, there is no basis to "read more into the *Norman* statement than is proper given the otherwise-clear

law, from *Eastport S.S.* through *Testan* through later cases of this court, applying the requirement of a 'money-mandating' statute only to claims for money damages for government action *different from* recovery of money paid over to the United States under an illegal exaction." *Boeing Co.*, 968 F.3d at 1383 (emphasis added); *see also In re Am. Fertility Soc'y*, 188 F.3d 1341, 1347 (Fed. Cir. 1999) (holding that an earlier precedential decision is binding precedent on later panels). In short, there is no basis to apply a money-mandating requirement where a plaintiff is suing for money or property "improperly exacted or retained." *Testan*, 424 U.S. at 401. To the extent this Court interprets any of its precedents to foreclose Mr. Jenkins' due-process claim, Mr. Jenkins preserves the argument that such a precedent should be reconsidered en banc or overruled by the Supreme Court.

This Court should reverse the jurisdictional dismissal of the due-process claim and remand for further proceedings. *See also McDonald's Corp. v. United States*, 926 F.2d 1126, 1133 (Fed. Cir. 1991); *Raz v. Lee*, 343 F.3d 936, 938 (8th Cir. 2003) (per curiam).

## CONCLUSION

For the foregoing reasons, this Court should reverse the lower court's decision and remand for an evidentiary hearing to determine the amount of compensation to be awarded Mr. Jenkins. Alternatively, Mr. Jenkins requests that this Court reverse and remand for any necessary further proceedings on Mr. Jenkins' claims.

Dated: May 20, 2022

Respectfully submitted,

*/s/ H. Hunter Bruton*

James Burnham
H. Hunter Bruton
*Counsel of Record*
Megan E. Ball
Teressa Hamsher
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
hbruton@jonesday.com
jburnham@jonesday.com
meball@jonesday.com
thamsher@jonesday.com

*Counsel for Appellant Brodrick Jamar Jenkins*

# ADDENDUM

# TABLE OF CONTENTS


| Date | Description | First Appx Page of Document |
|---|---|---|
| 06/22/2021 | Order by Magistrate Judge Alice R. Senechal Granting in Part and Denying in Part Motion to Dismiss for Lack of Jurisdiction | Appx01 |
| 11/02/2021 | Order by Magistrate Judge Alice R. Senechal Granting the United States' Alternate Motion for Summary Judgment | Appx16 |
| 11/02/2021 | Clerk's Judgment in Favor of the United States against Brodrick Jamar Jenkins | Appx25 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

Brodrick Jamar Jenkins, )
)
Plaintiff, ) Case No. 3:19-cv-188
)
vs. ) **ORDER**
)
United States of America, )
)
Defendant. )

Plaintiff Brodrick Jamar Jenkins seeks to recover compensation for property seized and allegedly improperly sold without proper notice. Jenkins, an inmate at a federal penitentiary, filed a complaint asserting unconstitutional taking and due process claims against the United States under the Little Tucker Act, 28 U.S.C. § 1346(a), and a motion to appoint counsel. (Doc. 6; Doc. 7). The Little Tucker Act gives district courts jurisdiction over civil actions against the United States, for claims not exceeding $10,000, based on the Constitution, a federal statute or regulation, or any express or implied contract with the United States. 28 U.S.C. § 1346(a)(2).

The court granted Jenkins' motion to appoint counsel, appointed the Federal Public Defender to represent him, and permitted counsel to supplement the complaint. (Doc. 8). Counsel filed a supplement, (Doc. 12), and after initial screening of the complaint and supplement under 28 U.S.C. § 1915A, the court permitted Jenkins to proceed with his claim and ordered the Clerk to issue a summons and serve the United States, (Doc. 16). The United States filed an answer, (Doc. 22), and the court set deadlines for completion of discovery and for filing motions, (Doc. 31; Doc. 35; Doc. 38). The United States now moves to dismiss the complaint.

In his complaint and supplement, Jenkins asserts the government seized two vehicles—a 1987 Oldsmobile Cutlass and a 2001 Chevrolet Tahoe—pursuant to a search warrant, the government failed to inform him when the vehicles were no longer needed as evidence and could be returned to him, and an impound lot later sold the vehicles at an auction. Jenkins contends he is entitled to money damages in an amount less than $10,000. The United States contends the court lacks subject matter jurisdiction because Jenkins does not have standing to bring his claim and because his claim is barred by sovereign immunity. (Doc. 39). The parties have fully briefed the motion.

**Background**

On April 10, 2013, Jenkins pleaded guilty to a drug conspiracy charge and was subsequently sentenced to 252 months of imprisonment. United States v. Jenkins, No. 3:12-cr-91-1. Jenkins, proceeding pro se, moved for return of property seized in connection with the criminal case, id. at Docs. 888 and 891, and the United States responded that it would return certain property, including the two vehicles, if there were no other claims to the property, id. at Doc. 890. In light of the United States' response, the court found Jenkins' motions moot. Id. at Doc. 892.

Jenkins moved for reconsideration of the court's order, requesting, in part, that he not be held responsible for any vehicle towing or storage fees. Alternatively, in the event the United States was unable to locate his property, he requested monetary compensation. Id. at Doc. 900. The court appointed the Federal Public Defender to represent Jenkins in the criminal case. Id. at 901. After learning the vehicles had been sold by an impound lot, Jenkins filed a settlement proposal captioned as a motion. Id. at Doc. 938. After briefing, the court denied Jenkins' motion, concluding that because Jenkins' claim was, at that time, for an amount in excess of $10,000, the United States

Court of Federal Claims had exclusive jurisdiction. Id. at 947. Thereafter, Jenkins filed this civil action under the Little Tucker Act. (Doc. 6).

In support of his complaint, Jenkins submitted copies of an October 23, 2012 search warrant authorizing the search of the vehicles, inventory receipts listing property seized, and a September 15, 2017 Drug Enforcement Agency (DEA) report of investigation regarding the seized vehicles. That report, prepared by DEA Task Force Officer (TFO) Orie Oksendahl, states law enforcement seized the vehicles at Jenkins' residence in St. Paul, Minnesota, on October 11, 2012, Twin Cities Transport and Recovery then towed the vehicles to its impound lot in Oakdale, Minnesota, law enforcement put "a hold" on the vehicles while it obtained a search warrant for the vehicles, and the search warrant was executed on October 24, 2012. (Doc. 6-1; Doc. 12-1). TFO Oksendahl reported that, at the request of the United States Attorney's Office, she contacted Twin Cities Transport and Recovery on September 15, 2017, to ascertain the status of the vehicles and was informed that pursuant to company policy, the vehicles were sold in May 2014. Id. There is no evidence the vehicles were forfeited to the United States through an administrative proceeding.

Along with its motion to dismiss, the United States submitted an affidavit of Renee Gardas, the owner and manager of Twin Cities Transport and Recovery. (Doc. 41). Gardas stated that on October 21, 2013, the Minnesota Bureau of Criminal Apprehension "released holds" on the vehicles and Twin Cities Transport and Recovery sent letters to Stephanie Buchanan, the registered owner of the vehicles, notifying her that each of the vehicles could be reclaimed upon payment of towing and storage charges. Gardas stated that on February 2, 2014, Twin Cities Transport and Recovery sent Buchanan, via certified mail, a "Final Notice" explaining the vehicles would be sold

if they were not reclaimed. Gardas further stated that no one reclaimed the vehicles so the 2001 Tahoe was sold on May 9, 2014, and the 1987 Cutlass was sold on May 12, 2014. Id. Documents attached to Gardas' affidavit show the letters were mailed to Buchanan in Minneapolis, Minnesota, at an address associated with her as the owner of the vehicles, according to motor vehicle registration queries. (Doc 41-1 to -4).

In response to the motion to dismiss, Jenkins' submitted his own affidavit and that of Buchanan, who is Jenkins' mother. Jenkins stated he purchased the 1987 Cutlass from a private seller for $5,000 at the end of 2011 and transferred title to Buchanan in early 2012. (Doc. 53). He stated he purchased the 2001 Tahoe from a private seller for $6,500 in 2012 and transferred title to Buchanan several months later. He stated, "Despite my mother being the title holder, I retained ownership and exclusive use of both the 1987 Oldsmobile Cutlass and the 2001 Chevrolet Tahoe." Id. He noted that his wallet with his identification, along with other items of his personal property, were seized during the search of the 2001 Tahoe. Id. He further stated he "was never advised of the location of either vehicle until [he] received information from the Federal Public Defenders Office that [his] vehicles had been held by Twin Cities Transport and Recovery and were sold in 2014" and "at no time did [his] mother advise [him] of the location of either vehicle." Id.

Buchanan's affidavit is consistent with Jenkins' affidavit. Buchanan stated she was aware that Jenkins had purchased the vehicles, he asked that the titles be transferred to her and she agreed, and "it was understood between [her] son and [she] that he was the owner of the vehicle[s] and exclusive user of the vehicle[s]." (Doc. 54). She stated she never received notice that either vehicle could be retrieved or that either vehicle would be sold or auctioned. She explained that because she surrendered for

service of a sentence in the District of Minnesota on November 18, 2013, she did not live at the Minneapolis address when the notice letters were mailed and "no other family members or others known to [her] resided at that address after [her] incarceration." Id.

## Law and Discussion

Jurisdiction is a threshold question that must be decided at the outset of a case. Green Acres Enters., Inc. v. United States, 418 F.3d 852, 856 (8th Cir. 2005) (citing Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990)). When a motion to dismiss challenges the factual basis of a court's jurisdiction, the court may consider affidavits or other documents outside the pleadings without converting the motion to one for summary judgment.[1] Moss v. United States, 895 F.3d 1091, 1097 (8th Cir. 2018). In responding to the motion, the plaintiff bears the burden of establishing subject matter jurisdiction and must prove jurisdictional facts by a preponderance of the evidence. Buckler v. United States, 919 F.3d 1038, 1044 (8th Cir. 2019); Moss, 895 F.3d at 1097.

### 1. Standing

For a court to have subject matter jurisdiction, the plaintiff must have standing to bring a claim. Standing requires a plaintiff to show an actual or threatened injury, resulting from the challenged conduct of the defendant, that could likely be redressed by a decision favorable to the plaintiff. California v. Texas, Nos. 19-840 & 19-1019, 2021 WL 2459255, at *4 (U.S. June 17, 2021); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). The court next addresses each of the three requirements for standing.

---

[1] The United States moves to dismiss under Federal Rule of Civil Procedure 12(b)(1). Technically, motions challenging subject matter jurisdiction filed after an answer should be brought under Rules 12(c) and 12(h)(3), but that distinction is purely formal because the standard that applies is the same as that of Rule 12(b)(1). Jahnke v. R.J. Constr., Inc., No. 13-962, 2014 WL 4639831, at *5 (D. Minn. Sept. 16, 2014).

**A. Actual Injury**

The United States argues Jenkins has not established he suffered any injury because Buchanan, not Jenkins, was the registered owner of the vehicles. (Doc. 40, p. 7). Jenkins contends that though he transferred title to Buchanan, he purchased the vehicles, "functioned as the recognized owner," and "retained exclusive and sole use." (Doc. 51, p. 5). Though title is generally conclusive of vehicle ownership, Jenkins asserts Minnesota law recognizes testimony of the buyer and seller may rebut that presumption. Further, Jenkins notes the seizure of the vehicles was in connection with criminal proceedings against him, not Buchanan, and the United States failed to inform either him or Buchanan of the seizure. Id. at 6.

For purposes of determining standing, an injury is "an invasion of a legally protected interest." Lujan, 504 U.S. at 560. "Ownership interest can be shown by actual possession, control, title, and financial stake" and is defined by state law. United States v. Premises Known as 7725 Unity Ave. N., Brooklyn Park, Minn., 294 F.3d 954, 956 (8th Cir. 2002).

The United States, relying on Jackson v. United States, 526 F.3d 394 (8th Cir. 2008), contends Jenkins cannot show a lawful entitlement to the vehicles. (Doc. 40, p. 10). In Jackson, the plaintiff moved for return of certain property seized at the time of his arrest. The seized property included stereo/video equipment and wheel rims that the plaintiff had installed on a vehicle his girlfriend leased from Ford Motor Company and clothing that was inside the vehicle. A towing company released the clothing to the plaintiff's girlfriend's grandmother and "representative," and Ford repossessed the vehicle upon default on the lease. Before the repossession, the stereo/video equipment was stolen. Though noting "a person from whom property is seized is presumed to have

a right to its return," the court determined the United States proved the plaintiff's girlfriend had a claim of ownership adverse to the plaintiff since the stereo/video equipment was purchased in her name and she filed an insurance claim and recovered for the loss of the equipment, and since the girlfriend's grandmother, acting on behalf of the lessee, signed a receipt for the clothing with the stated purpose on the receipt: "Return to Owner/[grandmother's name]."[2] 526 F.3d at 396-97. The Eighth Circuit remanded for determination of the plaintiff's claim to compensation for the wheel rims.

Unlike the plaintiff's girlfriend in Jackson, Buchanan has not asserted any claim of ownership of the vehicles adverse to Jenkins. Further, the United States overlooks that the Jackson court held the plaintiff had an ownership interest in the wheel rims because he "was using them and possessing them at the time they were seized" and had introduced evidence that he had purchased the rims and had installed them on the vehicle leased to his girlfriend. Thus, Jackson does not support the proposition that Jenkins had no ownership interest in the vehicles.

In City of Bloomington v. One 1991 Honda Accord, the Minnesota Court of Appeals determined an individual had an ownership interest and therefore had standing to contest the forfeiture of a vehicle where the title holder sold the vehicle to the contester's brother, the contester and his brother stipulated that the contester owned the vehicle, but neither the contester nor his brother had transferred title of the vehicle from the title holder. No. C5-01-1322, 2002 WL 47124, at *1 (Minn. Ct. App. Jan 15,

---

[2] The court concluded the receipt was sufficient to prove that Jackson's girlfriend, acting through her grandmother, asserted an adverse claim of ownership of the clothing. Jackson, 526 F. 3d at 397.

2002) (unpublished). This case supports Jenkins' assertion that testimony may rebut the presumption that title is conclusive of ownership.

Considering the Jenkins and Buchanan affidavits and TFO Oksendahl's report, Jenkins has established by a preponderance of the evidence that he had an ownership interest in both vehicles under One 1991 Honda Accord. Both Jenkins and Buchanan stated Jenkins bought, owned, and controlled the vehicles, despite the titles having been held in Buchanan's name. Further, Jenkins' wallet and identification were inside one of the vehicles, and the vehicles were seized from Jenkins' residence in connection with criminal proceedings against him. Thus, Jenkins has sufficiently shown he suffered an actual injury.

**B. Causation**

The United States argues that even if Jenkins had a legally protected interest in the vehicles, he cannot establish the United States caused any injury he suffered. (Doc. 40, p. 7). The government states that after the holds were released, Twin Cities Transport and Recovery had physical possession of the vehicles and eventually sold them; thus, it contends Jenkins' claims "lie with Twin Cities Transport and Recovery, not the United States." Id. at 8. Jenkins argues the United States, not Twin Cities Transport and Recovery, seized the vehicles and then "simply handed the vehicles over to Twin Cities Transport and Recovery" without providing notice of the vehicles' location or information about how to retrieve them. (Doc. 51, p. 6). The United States counters that Jenkins cited no authority suggesting it had any duty to inform him that the holds had been released and contends Twin Cities Transport and Recovery complied with notice requirements under Minnesota law. (Doc. 55, p. 5).

To establish causation for the purpose of standing, the plaintiff's injury must be fairly traceable to the challenged conduct of the defendant. Miller v. Redwood Toxicology Lab'y, Inc., 688 F.3d 928, 935 (8th Cir. 2012) (citing Lujan, 504 U.S. at 560-61). "When the injury alleged is the result of actions by some third party, not the defendant, the plaintiff cannot satisfy the causation element of the standing inquiry." Id. (citation omitted). "An injury may be 'fairly traceable' to a defendant for causation purposes even when that defendant's actions are not 'the very last step in the chain of causation.'" Wieland v. U.S. Dep't of Health and Human Servs., 793 F.3d 949, 954 (8th Cir. 2015) (quoting Bennet v. Spear, 520 U.S. 154, 168-69 (1997)). "Proximate causation is not a requirement of Article III standing." Lexmark Int'l Inc. v. Static Control Components, Inc., 572 U.S. 118, 134 n.6 (2014).

Whether the United States had a duty to notify Jenkins of the location of the seized vehicles and how he could reclaim them, and whether there is a causal connection between Jenkins' injury and the United States' conduct for the purpose of standing are separate questions. "Courts 'assume that on the merits the plaintiffs would be successful in their claims' when analyzing standing." Religious Sisters of Mercy v. Azar, Nos. 3:16-cv-386 & 3:16-cv-432, 2021 WL 191009, at *11 (D.N.D. Jan. 19, 2021) (quoting Am. Farm Bureau Fed'n v. U.S. Env't Prot. Ass'n, 836 F.3d 963, 968 (8th Cir. 2016)). It is undisputed that the United States seized Jenkins' vehicles but did not notify Jenkins where the vehicles were held or when the holds on the vehicles were released. Regardless of whether Jenkins would be successful on the merits of his claim, for purposes of determining standing, he has demonstrated, by a preponderance of the evidence, a causal connection between his loss of the vehicles and the United States' conduct.

### C. Redressability

The United Stated contends Jenkins cannot establish redressability because there is no connection between the United States' actions and Jenkins' injury. Jenkins asserts compensatory damages would redress his injury.

The United States conflates causation and redressability, which are distinct standing requirements. See, e.g., United States v. Hayes, 515 U.S. 737, 743 (1995). And while compensatory damages would redress Jenkins' injury, the United States also asserts he cannot recover compensatory damages because the United States it is entitled to sovereign immunity. In the absence of a waiver of sovereign immunity, Jenkins' claim for money damages would be barred. See United States v. Mitchell, 445 U.S. 535, 538 (1980). Thus, the court must consider whether sovereign immunity applies to determine whether Jenkins' claim is redressable.

### 2. Sovereign Immunity

Absent an explicit waiver of sovereign immunity, a complaint against the United States must be dismissed for lack of jurisdiction. United States v. Testan, 424 U.S. 392, 399 (1976). Jenkins contends the Little Tucker Act waives the government's sovereign immunity, permitting him to seek money damages for the United States' alleged violation of his Fifth Amendment property and due process rights. The United States argues the Little Tucker Act does not waive its sovereign immunity because Jenkins has not stated a Fifth Amendment claim that would entitle him to any relief.[3]

---

[3] The United States also contends the Little Tucker Act does not waive its sovereign immunity because Jenkins cannot recover money damages under Federal Rule of Criminal Procedure 41(g). (Doc. 40, p. 12). While Jenkins discussed Rule 41(g) in the supplement to his complaint, he acknowledged that Rule 41(g) only allows a court to order the return of property. He further explained that because the United States no

As stated above, the Little Tucker Act gives district courts jurisdiction over civil actions against the United States, for claims not exceeding $10,000, based on the Constitution, a federal statute or regulation, or any express or implied contract with the United States. 28 U.S.C. § 1346(a)(2). The Little Tucker Act does not create any substantive rights but is a jurisdictional provision that waives the United States' sovereign immunity for claims premised on those other sources of law. United States v. Bormes, 568 U.S. 6, 16-17 (2012). "If a claim falls within the terms of the [Little] Tucker Act, the United States has presumptively consented to suit." United States v. Mitchell, 463 U.S. 206, 216 (1983).

Jenkins bases his claim on the Fifth Amendment to the United States Constitution. Claims for money damages against the United States premised on the Constitution are cognizable under the Little Tucker Act if the substantive law the plaintiff relies on is money-mandating—meaning the substantive law "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." Id. (quoting United States v. Testan, 424 U.S. 392, 400 (1976)). If a plaintiff identifies a money-mandating source of law and "makes a nonfrivolous assertion that [the plaintiff] is within the class of plaintiffs entitled to recover under the money-mandating source," the court has jurisdiction. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1307 (Fed. Cir. 2008). That is true "even if those claims are frivolous on the merits." Id. at 1304-05. "[T]he merits of the claim [are] not pertinent to the jurisdictional inquiry." Id. (citing United States v. White Mountain Apache Tribe, 537 U.S. 465, 476 n.4 (2003)). The court is not to consider facts specific

longer possessed his vehicles, he brought the instant action for money damages under the Little Tucker Act rather than proceeding under Rule 41(g). (Doc. 12, pp. 4-5).

to the plaintiff's claims to determine whether it has jurisdiction. Id. at 1308. Only after the court concludes it has jurisdiction does it consider whether plaintiff's factual allegations state a claim within the parameters of the substantive law. Id. If a plaintiff fails to demonstrate entitlement to relief under the substantive law, the complaint should be dismissed under Rule 12(b)(6) rather than under Rule 12(b)(1). Id. at 1307-08.

### A. Money-Mandating Source of Law

"It is undisputed that the Takings Clause of the Fifth Amendment is a money mandating source for purposes of [Little] Tucker Act jurisdiction." Jan's Helicopter, 525 F.3d at 1309. Plaintiffs alleging a government taking of their property "are within the class of plaintiffs entitled to recover if a takings claim is established," and the court has jurisdiction over those claims. Id. Since Jenkins has alleged a government takings claim under a money-mandating source, this court has jurisdiction over that claim regardless of whether Jenkins will ultimately succeed on the merits of that claim. Thus, the United States has waived its sovereign immunity as to that claim.

### B. Merits of Fifth Amendment Claim

The United States contends Jenkins cannot maintain a takings claim under the Fifth Amendment, asserting (1) the government did not take his vehicles for public use, (2) Jenkins does not have a valid property interest in the vehicles, and (3) a third-party impound lot sold the vehicles.[4] (Doc. 40, pp. 12-13). As discussed above, in deciding a

[4] The government also contends, to the extent Jenkins makes a claim for wrongful detention of the vehicles, Kosak v. United States, 465 U.S. 848 (1984), bars that claim. Because Jenkins has not made a claim for wrongful detention of the vehicles, the court need not address the argument.

motion under Rule 12(b)(1), the merits of Jenkins' claim are not relevant to whether this court has jurisdiction.

The government argues Steward v. United States, 80 Fed. Cl. 540 (Fed. Cl. 2008), is squarely on point with this case. (Doc. 55, p. 7). In Steward, the Court of Federal Claims dismissed the pro se plaintiffs' takings claims for lack of jurisdiction and for failure to state a claim because property seized from the plaintiffs pursuant to lawful criminal proceedings was not taken for public use. 80 Fed. Cl. at 543. In determining the court lacked jurisdiction, Steward relied on Moden v. United States, 404 F.3d 1335 (Fed. Cir. 2005), and stated that, under Moden, the court has jurisdiction only over "non-frivolous takings claims against the United States." 80 Fed. Cl. at 543. However, the majority in Jan's Helicopter, decided by the Federal Circuit Court of Appeals shortly after Steward, declined to read Moden in the same way as the Steward court and the dissent in Jan's Helicopter. The Jan's Helicopter majority explained:

> The dissent urges that our decision here, and presumably our decisions in In re United States[, 463 F.3d 1328 (Fed. Cir. 2006)] and Greenlee [Cnty., Ariz. v. United States, 487 F.3d 871 (Fed. Cir. 2007)] are inconsistent with Moden v. United States, 404 F.3d 1335 (Fed. Cir. 2005). In light of our en banc decision in Fisher [v. United States, 402 F.3d 1167 (Fed. Cir. 2005)], we decline to read Moden, as the dissent does, as determining that a plaintiff's claim as a whole must be nonfrivolous to establish Tucker Act jurisdiction. Consistent with Fisher, we read Moden as holding that the plaintiff must make a nonfrivolous allegation that it is within the class of plaintiffs entitled to recover under the money-mandating source of law.
>
> In any event, the court's statements, quoted at page 4 of the dissent, are dicta, and we are not bound by them, because the court did not consider the possibility that under Fisher a nonfrivolous allegation on the merits of the claim was not required. . . . Indeed, the opinion's failure to consider this issue is not surprising, because the government did not raise it, but simply argued that the plaintiffs' inability to make out a successful inverse condemnation claim on the merits deprived the Court of Federal Claims of jurisdiction.

Jan's Helicopter, 525 F.3d at 1308 n.9. After the Court of Federal Claims decided Steward, the Federal Circuit Court of Appeals made clear in Jan's Helicopter that a court should not determine the merits of a claim when deciding if it has jurisdiction under the Little Tucker Act. Thus, whether Jenkins has stated a meritorious claim under the Fifth Amendment has no bearing on this court's jurisdiction.

### C. Due Process

The United States also asserts Jenkins cannot maintain a due process claim under the Fifth Amendment, contending the United States had no duty to notify Jenkins about the vehicles because (1) Jenkins was not the registered owner of the vehicles, (2) the United States did not hold the vehicles, (3) the United States did not sell the vehicles, and (4) the impound lot sent notice letters to Buchanan. (Doc. 40, p. 15). Again, the inquiry into whether the court has jurisdiction over Jenkins' claims does not include a review of the merits of those claims, including whether the United States owed any duty to Jenkins.

As discussed above, the primary jurisdictional issue is whether the Fifth Amendment's Due Process Clause is money-mandating. It is well settled that it is not. May v. United States, 104 Fed. Cl. 278, 283-84 (Fed. Cl. 2012)[5] (citing LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995)) (holding, in part, the Due Process Clause of the Fifth Amendment does not provide "a sufficient basis for jurisdiction [under the

[5] While the May court dismissed the plaintiff's Fifth Amendment due process claim for lack of jurisdiction, it dismissed the plaintiff's Fifth Amendment takings claim for failure to state a claim, rather than for lack of jurisdiction, because plaintiff had not alleged a governmental taking of a cognizable property interest. May, 104 Fed. Cl. at 287.

Tucker Act] because [it does] not mandate payment of money by the government").[6] Thus, the United States has not waived its sovereign immunity as to Jenkins' due process claim, that claim is therefore not redressable, and Jenkins lacks standing to assert that claim. In short, the court lacks jurisdiction over Jenkins's Fifth Amendment due process claim.

## Conclusion

The United States moves to dismiss Jenkins' complaint for lack of jurisdiction. As discussed above, under the Little Tucker Act, the court has jurisdiction over Jenkins' Fifth Amendment takings claim but does not have jurisdiction over his Fifth Amendment due process claim. The United States' motion, (Doc. 39), is therefore **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED**.

Dated this 22nd day of June, 2021.

*/s/ Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

[6] The Tucker Act and the Little Tucker Act are companion statutes, and their jurisdictional provisions are similarly interpreted. United States v. Bormes, 568 U.S. 6, 10 (2012).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Brodrick Jamar Jenkins, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:19-cv-188 |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Brodrick Jamar Jenkins filed a complaint asserting unconstitutional takings and due process claims against the United States under the Little Tucker Act, 28 U.S.C. § 1346(a).[1] Jenkins seeks to recover compensation for two vehicles seized and allegedly sold without proper notice. Because the vehicles were seized pursuant to governmental police power rather than for public use, Jenkins' complaint will be dismissed.

## Background

Jenkins asserts the government seized two vehicles—a 1987 Oldsmobile Cutlass and a 2001 Chevrolet Tahoe—pursuant to a search warrant, the government failed to inform him when the vehicles were no longer needed as evidence and could be returned to him, and an impound lot later sold the vehicles at an auction. Jenkins contends he is entitled to money damages in an amount less than $10,000. Previously, the United States moved to dismiss, asserting the court lacked subject matter jurisdiction because

[1] The Little Tucker Act gives district courts jurisdiction over civil actions against the United States for claims not exceeding $10,000 based on the Constitution, a federal statute or regulation, or any express or implied contract with the United States. 28 U.S.C. § 1346(a)(2).

Jenkins did not have standing to bring his claims and because his claims are barred by sovereign immunity. An order of June 22, 2021 denied the motion as to Jenkins' Fifth Amendment takings claim but granted the motion as to Jenkins' Fifth Amendment due process claim. (Doc. 60).

The United States now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) or alternatively for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Jenkins' remaining claim. The United States contends Jenkins cannot recover under the Fifth Amendment takings clause because the vehicles were seized pursuant to the government's police power rather than taken for public use. (Doc. 67). Jenkins does not contest the original seizure of the vehicles was proper under the government's police power. Rather, he argues the seizure amounted to a taking when the government failed to return the vehicles and allowed them to be sold at auction. (Doc. 71, p. 7).

The June 22, 2021 order described relevant factual background:

> On April 10, 2013, Jenkins pleaded guilty to a drug conspiracy charge and was subsequently sentenced to 252 months of imprisonment. Jenkins, proceeding pro se, moved for return of property seized in connection with the criminal case, and the United States responded that it would return certain property, including the two vehicles, if there were no other claims to the property. In light of the United States' response, the court found Jenkins' motions moot.
>
> Jenkins moved for reconsideration of the court's order, requesting, in part, that he not be held responsible for any vehicle towing or storage fees. Alternatively, in the event the United States was unable to locate his property, he requested monetary compensation. The court appointed the Federal Public Defender to represent Jenkins in the criminal case. After learning the vehicles had been sold by an impound lot, Jenkins filed a settlement proposal captioned as a motion. After briefing, the court denied Jenkins' motion, concluding that because Jenkins' claim was, at that time, for an amount in excess of $10,000, the United States Court of Federal

Claims had exclusive jurisdiction. Thereafter, Jenkins filed this civil action under the Little Tucker Act.

In support of his complaint, Jenkins submitted copies of an October 23, 2012 search warrant authorizing the search of the vehicles, inventory receipts listing property seized, and a September 15, 2017 Drug Enforcement Agency (DEA) report of investigation regarding the seized vehicles. That report, prepared by DEA Task Force Officer (TFO) Orie Oksendahl, states law enforcement seized the vehicles at Jenkins' residence in St. Paul, Minnesota, on October 11, 2012, Twin Cities Transport and Recovery then towed the vehicles to its impound lot in Oakdale, Minnesota, law enforcement put "a hold" on the vehicles while it obtained a search warrant for the vehicles, and the search warrant was executed on October 24, 2012. TFO Oksendahl reported that, at the request of the United States Attorney's Office, she contacted Twin Cities Transport and Recovery on September 15, 2017, to ascertain the status of the vehicles and was informed that pursuant to company policy, the vehicles were sold in May 2014. There is no evidence the vehicles were forfeited to the United States through an administrative proceeding.

Along with its motion to dismiss, the United States submitted an affidavit of Renee Gardas, the owner and manager of Twin Cities Transport and Recovery. Gardas stated that on October 21, 2013, the Minnesota Bureau of Criminal Apprehension "released holds" on the vehicles and Twin Cities Transport and Recovery sent letters to Stephanie Buchanan, the registered owner of the vehicles, notifying her that each of the vehicles could be reclaimed upon payment of towing and storage charges. Gardas stated that on February 2, 2014, Twin Cities Transport and Recovery sent Buchanan, via certified mail, a "Final Notice" explaining the vehicles would be sold if they were not reclaimed. Gardas further stated that no one reclaimed the vehicles so the 2001 Tahoe was sold on May 9, 2014, and the 1987 Cutlass was sold on May 12, 2014. Documents attached to Gardas' affidavit show the letters were mailed to Buchanan in Minneapolis, Minnesota, at an address associated with her as the owner of the vehicles, according to motor vehicle registration queries.

In response to the motion to dismiss, Jenkins submitted his own affidavit and that of Buchanan, who is Jenkins' mother. Jenkins stated he purchased the 1987 Cutlass from a private seller for $5,000 at the end of 2011 and transferred title to Buchanan in early 2012. He stated he purchased the 2001 Tahoe from a private seller for $6,500 in 2012 and transferred title to Buchanan several months later. He stated, "Despite my mother being the title holder, I retained ownership and exclusive use of both the 1987 Oldsmobile Cutlass and the 2001 Chevrolet Tahoe." He noted that his wallet with his identification, along with other items of his personal property, were seized during the search of the 2001 Tahoe. He further stated

> he "was never advised of the location of either vehicle until [he] received information from the Federal Public Defenders Office that [his] vehicles had been held by Twin Cities Transport and Recovery and were sold in 2014" and "at no time did [his] mother advise [him] of the location of either vehicle."
>
> Buchanan's affidavit is consistent with Jenkins' affidavit. Buchanan stated she was aware that Jenkins had purchased the vehicles, he asked that the titles be transferred to her and she agreed, and "it was understood between [her] son and [she] that he was the owner of the vehicle[s] and exclusive user of the vehicle[s]." She stated she never received notice that either vehicle could be retrieved or that either vehicle would be sold or auctioned. She explained that because she surrendered for service of a sentence in the District of Minnesota on November 18, 2013, she did not live at the Minneapolis address when the notice letters were mailed and "no other family members or others known to [her] resided at that address after [her] incarceration."

(Doc. 60, pp. 2-5) (internal citations omitted).

## Law and Discussion

The United States brings its motion under Federal Rule of Civil Procedure 12(c), which allows for entry of judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Rule 12(c) motions are governed by the same standard as are motions brought under Rule 12(b)(6). Ginsburg v. InBev NV/SA, 623 F.3d 1229, 1233 n.3 (8th Cir 2010). Under that standard, the court views all facts pleaded by the nonmoving party as true and grants all reasonable inferences in favor of that party. In addition to the pleadings themselves, the court may consider exhibits to the pleadings and matters embraced by the pleadings. The court will grant a motion under Rule 12(c) only if there are no disputed material facts and the moving party is entitled to judgment as a matter of law. Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999); Ashokkumar v. Elbaum, 932 F. Supp. 2d 996, 1006 (D. Neb. 2013).

If the court considers materials other than those allowed under Rule 12(c), the motion is to be treated as one for summary judgment. If treated as a motion for summary judgment, the court may review additional materials on file to determine whether a genuine issue of material fact is present. Carmichael v. Mercedes-Benz USA, LLC, No. 4:09-CV-00346-TJS, 2011 WL 13228238, at *2 (S.D. Iowa Jan. 20, 2011).

When deciding the earlier Rule 12 motion challenging the factual basis of subject matter jurisdiction, consideration of affidavits was appropriate under Moss v. United States, 895 F.3d 1091, 1097 (8th Cir. 2018). In deciding the current motion, the court has considered the same affidavits and therefore issues this decision pursuant to Rule 56.

Jenkins argues the United States' motion is merely a request for reconsideration of the June 22, 2021 order denying the motion to dismiss. (Doc. 71, p. 3). In reply, the United States asserts it is now advancing an argument on Jenkins' Fifth Amendment takings claim, which was not addressed in the earlier order. (Doc. 72, p. 4). The court agrees with the position of the United States. The earlier motion to dismiss was based on standing and sovereign immunity. In analyzing whether sovereign immunity barred the court's subject matter jurisdiction, the court declined to consider the merits of Jenkins' Fifth Amendment takings claim, though the court concluded it did not have jurisdiction over Jenkins' Fifth Amendment due process claim. (Doc. 60, pp. 14-15).

The Fifth Amendment to the Constitution of the United States prohibits governmental takings of private property for public use unless the property owner receives just compensation. But if the property is not taken for "public use," the property owner does not have a right to receive just compensation. Bennis v. Michigan, 516 U.S.

442, 452 (1996). If the government takes private property under the government's police power, the property is not taken for "public use" within the meaning of the Fifth Amendment. AmeriSource Corp. v. United States, 525 F.3d 1149, 1153 (Fed. Cir. 2008); United States v. Romero, No. 1:12-CR224, 2013 WL 625338, at *5 (D.N.D. Feb. 20, 2013).

Though acknowledging seizure of the two vehicles was within the scope of the government's police power, Jenkins argues a compensable taking "occurred when the [United States] never returned the property to Jenkins, which was not subject to forfeiture and was released from custody and later sold at auction." (Doc. 71, p. 5). Citing a state statute, the United States replies that when the government's holds were released, the impound lot—not the government—had the duty to notify the vehicle owner. The cited statute provides, "When an impounded vehicle is taken into custody, the unit of government or impound lot operator taking it into custody shall give written notice of the taking within five days, excluding Saturdays, Sundays, and legal holidays, to the registered vehicle owner and any lienholders." Minn. Stat. § 168B.06. That statute goes on to specify required content of the notice and states notice must be "sent by mail to the registered owner, if any, of an impounded vehicle and to all readily identifiable lienholders of record." The United States argues section 168B.06 did not require governmental notification to the registered owner since the impound lot operator had given notice and the statute required notification only to the vehicles' registered owner and any lienholders. (Doc. 72, p. 3).

Additionally, the United States contends Jenkins is actually asserting a procedural due process claim even though his procedural due process claims were

dismissed in the court's earlier order. In the view of the United States, the taking ended when holds on the vehicles were released. At that time, the vehicles were no longer under governmental control, and the impound lot operator sent immediate notice to the registered owner. Id. at 5-6.

Jenkins cites a case involving investigation of cruelty to animals. A representative of the Pennsylvania Society for the Prevention of Cruelty to Animals (SCPA), who had no court order to do so, took possession of "Lilly," the plaintiff's thoroughbred mare. A few days later and pursuant to a search warrant, the SPCA representative seized several other animals from the plaintiff. The animals that had been seized pursuant to the search warrant were later returned to the plaintiff. Included in the plaintiffs' multiple claims was a claimed violation of the Fifth Amendment takings clause. On that claim, the court concluded there had been no taking of the property that was seized pursuant to a valid search warrant, held during a criminal investigation, and later returned. But because the allegedly unreturned mare, Lilly, had not been seized pursuant to a search warrant, the court allowed the Fifth Amendment takings claim to proceed as to Lilly. Ritzel v. Penn. Soc. for the Prevention of Cruelty to Animals (SPCA), No. 04-2757, 2005 WL 331518 (E.D. Pa. Feb. 9, 2005). Ritzel is easily distinguishable from this case because Lilly had not been seized pursuant to a valid search warrant.

The United States cites several cases holding a compensable taking does not occur when property is seized pursuant to a valid search warrant and returned after conclusion of a criminal investigation. In Bennis v. Michigan, the Supreme Court stated, "The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the

power of eminent domain." 516 U.S. 442, 452 (1996). Amerisource Corp. addressed a Fifth Amendment takings claim brought by a company whose pharmaceuticals were seized pursuant to a search warrant involving a criminal investigation of third parties. 525 F.3d at 1150. The plaintiff was not accused of any wrongful act. When the drugs were eventually returned, they were worthless because their expiration dates had passed. Though noting seeming unfairness, because the drugs had been seized pursuant to governmental police power, the court held there was no Fifth Amendment taking. The court stated, "As expansive as the police power may be, it is not without limit. The limits, however, are largely imposed by the Due Process Clause." Id. at 1154.

In Brisbane v. Milano, a vehicle was seized during a criminal investigation but later returned, although damaged. The plaintiff argued he was entitled to just compensation for depreciation in value of the vehicle. The court held the vehicle was never "taken" within the meaning of the Fifth Amendment and the decrease in the vehicle's value while in police custody did not constitute a taking within the meaning of the Fifth Amendment. No. 3:08-cv-1328, 2010 WL 3000975 (D. Conn. July 27, 2010).

Jenkins has cited no case recognizing a Fifth Amendment taking under similar facts, and this court's research has identified none. Jenkins' claim, in essence, is that the United States did not follow proper procedure in releasing the vehicles from governmental custody and allowing them to be sold. Though seemingly inequitable, the law does not allow a remedy against the United States for Jenkins' loss of the vehicles.

## Conclusion

The Fifth Amendment takings clause does not encompass a claim for just compensation for property seized under governmental police power under the facts of

this case. There is no genuine dispute as to any material fact and the United States is entitled to judgment as a matter of law. It is **ORDERED** that the United States' alternative motion for summary judgment, (Doc. 66), is **GRANTED** and Jenkins' complaint, (Doc. 6), is **DISMISSED**. Because any appeal would not be frivolous, it is further **ORDERED** that any appeal may be taken in forma pauperis.

**JUDGMENT SHALL BE ENTERED ACCORDINGLY**.

Dated this 2nd day of November, 2021.

*/s/ Alice R. Senechal*
Alice R. Senechal
United States Magistrate Judge

Local AO 450 (rev. 5/10)

# United States District Court

## *District of North Dakota*

Brodrick Jamar Jenkins,

Plaintiff,

vs.

United States of America,

Defendant.

JUDGMENT IN A CIVIL CASE

Case No. 3:19-cv-188

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☐ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

☑ **Decision on Motion**. This action came before the Court on motion. The issues have been considered and a decision rendered.

☐ **Stipulation**. This action came before the court on motion of the parties. The issues have been resolved.

☐ **Dismissal**. This action was voluntarily dismissed by Plaintiff pursuant to Fed. R. Civ. P. 41(a)(1)(ii).

**IT IS ORDERED AND ADJUDGED:**

Pursuant to the Order dated November 2, 2021, (Doc. 73), the United States' alternative motion for summary judgment, (Doc. 66), is GRANTED and Jenkins' complaint, (Doc. 6), is DISMISSED. Because any appeal would not be frivolous, it is further ORDERED that any appeal may be taken in forma pauperis.

Date: November 2, 2021

ROBERT J. ANSLEY, CLERK OF COURT

by: */s/ Pamela Bloomquist-Burman, Deputy Clerk*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f) and Circuit Rule 32(b)(2), the brief contains 10,862 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Century Schoolbook font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: May 20, 2022

*/s/ H. Hunter Bruton*
H. Hunter Bruton