**No. 2022-1378**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

BRODRICK JAMAR JENKINS,
*Plaintiff-Appellant*,

*v.*

UNITED STATES,
*Defendant-Appellee*.

On Appeal from the United States District Court for the District of North Dakota (No. 3:19-cv-00188-ARS), Hon. Alice Senechal

# BRIEF FOR THE HUMAN RIGHTS DEFENSE CENTER AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT AND REVERSAL

Daniel Woofter
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636

*Counsel for Amicus Curiae Human Rights Defense Center*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1378

**Short Case Caption** Jenkins v. US

**Filing Party/Entity** Amicus Curiae Human Rights Defense Center

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/27/2022

Signature: /s/ Daniel Woofter

Name: Daniel Woofter

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Human Rights Defense Center | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST

TABLE OF AUTHORITIES ........ ii

INTERESTS OF AMICUS ........ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 4

I. Civil forfeiture has evolved from its original, narrow focus into an essentially unchecked revenue-generating tool for law enforcement ........ 4

II. Civil forfeiture as a tool for generating revenue perversely incentivizes the government to target vulnerable communities at the expense of public safety ........ 11

III. Vulnerable communities are harmed the most when their property is taken ........ 17

CONCLUSION ........ 21

# TABLE OF AUTHORITIES

## Cases

*Bennis v. Michigan*,
516 U.S. 442 (1996) ........ 8

*Leonard v. Texas*,
137 S. Ct. 847 (2017) ........ 4, 5, 17

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) ........ 8

## Rules

Fed. R. Crim. P. 41 ........ 2

Fed. R. Crim. P. 41(g) ........ 2

## Other Authorities

ACLU, *Guilty Property: How Law Enforcement Takes $1 Million in Cash from Innocent Philadelphians Every Year—and Gets Away With It* (June 2015), https://tinyurl.com/2s42rjbs ........ 19

Pamela Brown, *Parent's House Seized After Son's Drug Bust*, CNN (Sept. 8, 2014), https://tinyurl.com/yx7dunxx ........ 19

Dick Carpenter et al., *The Complex Process of Civil Forfeiture* (Feb. 21, 2022), https://tinyurl.com/5ds23zwe ........ 9, 19

Dick M. Carpenter II et al., *Policing for Profit: The Abuse of Civil Asset Forfeiture* (2d ed. 2015) ........ 7, 8, 10

Civ. Rts. Div., U.S. Dep't of Just., *Investigation of the Ferguson Police Department* (2015), https://tinyurl.com/2tr7audx ........ 13

Beth A. Colgan, "Fines, Fees, and Forfeitures" *in Reforming Criminal Justice – Volume 4: Punishment, Incarceration, and Release* 205 (Erik Luna ed., 2017) ........ 11

Cong. Rsch. Serv., 97-139, *Crime and Forfeiture* (Jan. 22, 2015), https://tinyurl.com/3uf8345t ........ 9

Stefan B. Herpel, *Toward a Constitutional Kleptocracy: Civil Forfeiture in America*, 96 Mich. L. Rev. 1910 (1998) ........ 11

Inst. for Just., *Policing for Profit, Minnesota*, https://tinyurl.com/bdhh4y38 (last visited May 27, 2022) .................. 10

Inst. for Just., *Policing for Profit, North Dakota*, https://tinyurl.com/yckme2c8 (last visited May 27, 2022) .................. 10

Brent D. Mast, Bruce L. Benson & David W. Rasmussen, *Entrepreneurial Police and Drug Enforcement Policy*, 104 Pub. Choice 285 (2000) .................. 12

Brian McVeigh & Dave Sutton, *Don't Gut Civil Asset Forfeiture*, AL.com (Feb. 12, 2018), https://tinyurl.com/yv9nfh2f .................. 17

Robert O'Hara, Jr., Steven Rich & Shelly Tan, *Asset Seizures Fuel Police Spending*, Wash. Post (Oct. 11, 2014), https://tinyurl.com/yj7evhxm .................. 12

Office of the Inspector Gen., U.S. Dep't of Just., *Review of the Department's Oversight of Cash Seizure and Forfeiture Activities* (Mar. 2017), https://tinyurl.com/ytmrvz26 .................. 7

Connor Sheets, *Alabama Asset Forfeiture Bill Went from Broad Reforms to 'Best We Can Do'*, AL.com (May 5, 2021), https://tinyurl.com/2yxc5pvx .................. 17

Sara Stillman, *Taken*, The New Yorker (Aug. 5, 2013), https://tinyurl.com/yy3e64bx .................. *passim*

Daniel Weeks, *Why Are the Poor and Minorities Less Likely to Vote?*, The Atlantic (Jan. 10, 2014), https://tinyurl.com/2nrkc8n4 .................. 16

John L. Worrall, *Addicted to the Drug War: The Role of Civil Asset Forfeiture as a Budgetary Necessity in Contemporary Law Enforcement*, 29 J. Crim. Just. 171 (2001) .................. 11

## INTERESTS OF AMICUS*

The Human Rights Defense Center (HRDC) is a nonprofit charitable corporation headquartered in Florida that advocates nationally in furtherance of the human rights of people involved in the criminal justice system. HRDC's advocacy efforts include publishing two monthly publications, *Prison Legal News*, which covers national and international news and litigation concerning prisons and jails, and *Criminal Legal News*, which is focused on criminal law and procedure and policing issues. HRDC also publishes and distributes self-help and legal reference books for prisoners, and engages in litigation in state and federal courts on issues concerning detainees.

## INTRODUCTION AND SUMMARY OF ARGUMENT

According to the government in this case, federal agents may take a criminal suspect's property and keep it—without procedural protections or paying for it—so long as there is an investigative reason to do so at the outset, and even when that reason no longer exists. This position

* No person other than amicus curiae, its members, or its counsel contributed money intended to fund preparing or submitting this brief. No party or party's counsel authored the brief in whole or in part, and all parties have consented to its filing.

is striking. The government is asking this Court to hold that even the minimal due process protections required of civil forfeiture do not need to be observed by the government to dispossess criminal defendants, like Mr. Jenkins, of their property. The negative aspects of civil forfeiture will be amplified if the government wins.

As highlighted in Mr. Jenkins' opening brief, he should have been afforded the *much higher* procedural protections required for criminal defendants under Federal Rule of Criminal Procedure 41, because the government did not seek to dispossess him of his property through civil forfeiture. Thus, Mr. Jenkins filed a motion for return of his property pursuant to Rule 41(g), which the district court denied on the basis of the United States' representation that "it would return … the two vehicles" it had seized from him. *See* Appx17. But when the government learned that the vehicles had been sold by the impound lot where they had been stored, it turned around and said even the custodial obligations imposed on the government under Rule 41 did not apply.

It is difficult to think of a property right violation that would be more abhorrent to the Founders than one in which the government may take personal property without need, without procedural protections, and

without compensation. The principal brief of Mr. Jenkins sets forth why the government's uncompensated taking of his two vehicles violated federal law and the U.S. Constitution. HRDC offers its view as *amicus curiae* to explain how the experience in the civil forfeiture realm should caution the Court against agreeing with the government's position here. Given the experience with civil forfeiture, agreeing with the government's position will only further incentivize law enforcement to generate revenue by taking a vulnerable individual's property for itself.

Part I describes the evolution of civil forfeiture. At the founding, civil forfeiture was narrowly tailored and had greater due process protections. It has transmogrified into something much more abusive: In its modern practice, civil forfeiture is widely used by law enforcement agents to boost revenues for themselves at the expensive of private citizens, many of whom are not even charged with a crime.

Part II describes how this perversely incentivizes law enforcement agents to focus on revenue-generating activity at the expense of public safety. Those perverse incentives also lead law enforcement to target vulnerable communities that have the least ability to fight back: These communities often lack the resources required to navigate the unyielding,

draconian bureaucracies that stand as a roadblock to receiving back the property that is rightfully theirs.

Part III explains how civil forfeiture is particularly harmful to the vulnerable communities that law enforcement is incentivized to target. Seizing the property or cash that impoverished individuals rely on in their day-to-day lives forces them into a vicious cycle of growing economic disaster from which it is exceedingly difficult to recover. Accepting the government's position here will only serve to further harm disadvantaged Americans and racial minorities.

## ARGUMENT

### I. Civil forfeiture has evolved from its original, narrow focus into an essentially unchecked revenue-generating tool for law enforcement.

Civil forfeiture today is a far cry from its "discrete historical" beginnings. *See Leonard v. Texas*, 137 S. Ct. 847, 848 (2017) (Thomas, J., respecting the denial of certiorari). At the founding, civil forfeiture only narrowly applied to a few circumstances, and property claimants had many more procedural protections.

Thus, "historical forfeiture laws were narrower in most respects than modern ones." *Leonard*, 137 S. Ct. at 849. They "were limited to a

few specific subject matters, such as customs and piracy." *Ibid.* And "they typically covered only the instrumentalities of the crime (such as the vessel used to transport the goods), not the derivative proceeds of the crime (such as property purchased with money from the sale of the illegal goods)." *Ibid.*

And unlike the modern practice, the Supreme Court's "early cases suggested that forfeiture actions were in the nature of criminal proceedings," which had "important implications for a variety of procedural protections." *Leonard*, 137 S. Ct. at 849. For example, in addition to "the right to a jury trial," there is even "some evidence that the government was historically required to prove its case beyond a reasonable doubt." *Ibid.*

Starting in the 1970s, federal forfeiture statutes began to expand their reach and reduce procedural protections for property claimants. Sara Stillman, *Taken*, The New Yorker (Aug. 5, 2013), https://tinyurl.com/yy3e64bx. However, even these modern expansions were initially aimed at taking down serious scourges on society like "organized-crime bosses and drug lords." *Ibid.* The statutes thus limited the property

that could be seized to the money and goods tied to the production of illegal drugs. *Ibid.*

But things took a turn when the federal forfeiture statutes were amended in the late ’70s and early ’80s in ways that would have been foreign to the Founders. Those amendments for the first time allowed the seizure of “anything thought to have even been purchased with tainted funds.” Stillman, *supra*. Even then, forfeiture “remained an infrequent resort until 1984, when Congress passed the Comprehensive Crime Control Act.” *Ibid.* That Act for the first time “established a special fund that turned over proceeds from forfeitures to the law-enforcement agencies responsible for them,” and even allowed local police who assisted federal officers to be “rewarded with a large percentage of the proceeds, through a program called Equitable Sharing.” *Ibid.*

This last change caused a seismic shift, leading to the many abuses in civil forfeiture practice that we see today. With Equitable Sharing, civil forfeiture was changed from its original, narrowly tailored purpose of combatting serious crime into a tool for law enforcement officers to generate revenue for themselves.

Thus, unsurprisingly, revenue for the federal government generated through civil forfeiture exploded. In 1985, civil forfeiture brought in just $27 million dollars for the federal government. Stillman, *supra*. In 1993, that number had reached $556 million. *Ibid.* By 2017, the U.S. Department of Justice had raised a total of over *$28 billion* in the preceding decade. Office of the Inspector Gen., U.S. Dep't of Just., *Review of the Department's Oversight of Cash Seizure and Forfeiture Activities* i (Mar. 2017), https://tinyurl.com/ytmrvz26. That number did not even include forfeitures obtained through local or state proceedings. *Ibid.* Federal civil forfeitures alone increased 4,667% between 1986 and 2014. Dick M. Carpenter II et al., *Policing for Profit: The Abuse of Civil Asset Forfeiture* 5 (2d ed. 2015).

After Congress passed the Comprehensive Crime Control Act, States similarly saw the opportunity to increase their revenues and began enacting their own forfeiture laws. Stillman, *supra.* But "tales of abuse also emerged," *ibid.*, as further explained *infra* Part II. Yet despite calls for reform, it was too late: Law enforcement saw the opportunity to boost their coffers, and civil forfeiture statutes continued to proliferate. Many States, "facing fiscal crises, have" thus "expanded the reach of their

forfeiture statutes," and made it easier for law enforcement agencies to use the revenue however they see fit. Stillman, *supra.* Today, many States and the federal government permit 100% of forfeiture proceeds to flow directly to law enforcement. *Policing for Profit*, *supra*, at 14.

Despite the moniker, *civil* forfeiture proceedings are some of the most common because they have fewer procedural protections than those available in criminal proceedings. Now, even as to criminal defendants, prosecutors seeking forfeiture of property owned by those defendants may engage in civil proceedings with minimal due process protections—far fewer procedural protections than criminal defendants would otherwise enjoy. *See, e.g.*, *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 56-57 (1993). Such "*in rem*" proceedings are often permitted without any pre-deprivation judicial process, and prosecutors may obtain forfeiture of the property even when the owner is personally innocent. In other words, criminal defendants, including those who are eventually acquitted—indeed, even innocent third parties who were never the subject of a criminal investigation at all—often lose their property in civil forfeiture proceedings regardless. *See, e.g.*, *Bennis v. Michigan*, 516 U.S. 442, 443-44 (1996) (car subject to forfeiture despite co-ownership by innocent

third party); *see also* Cong. Rsch. Serv., 97-139, *Crime and Forfeiture* 5 (Jan. 22, 2015), https://tinyurl.com/3uf8345t ("[T]he guilt or innocence of the property owner is irrelevant; it is enough that the property was involved in a crime to which forfeiture attaches in the manner in which statute demands.").

Although States and the federal government have different civil forfeiture procedures, they share common features in their modern form. First, property is seized by law enforcement under an easy-to-meet "probable cause" standard. *See generally* Dick Carpenter et al., *The Complex Process of Civil Forfeiture* (Feb. 21, 2022), https://tinyurl.com/5ds23zwe. Prosecutors may then move to permanently keep the property, which requires publishing a notice so that any party with an interest in the property may file a claim for the seized asset. *Ibid.* If a defendant or third party makes a claim to the seized property, the government must show by "a preponderance" of the evidence—a far cry from the "beyond a reasonable doubt" standard that applies to finding a criminal defendant guilty—that there is a "connection" between the property and alleged criminal activity. *Ibid.* Again, that connection is met if the property is

"thought to have even been purchased with tainted funds." Stillman, *supra*.

The lower-burden/lower-cost regime has turned civil forfeiture into a highly profitable tool, and its use for this purpose is now widespread in governments at every level, local to federal. *See, e.g.*, *Policing for Profit*, *supra*, at 10 (Department of Justice Assets Forfeiture Fund took in $4.5 billion in 2014 alone). Minnesota and North Dakota for example—where Mr. Jenkins' cars were seized and his trial held, respectively—are rated very poorly by the Institute for Justice given their profit-generating civil forfeiture schemes. *See* Inst. for Just., *Policing for Profit, Minnesota*, https://tinyurl.com/bdhh4y38 (last visited May 27, 2022) ("Minnesota earns a D for its civil forfeiture laws" for "putting the burden on owners to engage in a costly legal battle and making it easy for the government to forfeit without a conviction," having "[p]oor protections for the innocent," and giving a "[l]arge profit incentive" for law enforcement to pursue forfeiture); Inst. for Just., *Policing for Profit, North Dakota*, https://tinyurl.com/yckme2c8 (last visited May 27, 2022) ("North Dakota earns a D- for its civil forfeiture laws" for the same reasons). Because most modern forfeiture statutes allow *all* of the proceeds from civil forfeiture to

flow directly to law enforcement, it is no surprise that law enforcement entities have a strong incentive to pursue forfeiture.

## II. Civil forfeiture as a tool for generating revenue perversely incentivizes the government to target vulnerable communities at the expense of public safety.

In their current form, "civil *in rem* forfeiture proceedings have been used—and increasingly are being used—as an expedient to circumvent the usual protections accorded to defendants in criminal proceedings, and to augment federal, state, and local treasuries." Stefan B. Herpel, *Toward a Constitutional Kleptocracy: Civil Forfeiture in America*, 96 Mich. L. Rev. 1910, 1911 (1998) (footnote omitted). When revenue generation is the primary driver of law enforcement, policing practices naturally give less attention to promoting public safety or respecting constitutional rights. This leads to less of a focus on violent crime because police forces can generate more revenue by focusing on other activities that involve more money (*e.g.*, drug proceeds). *See* Beth A. Colgan, "Fines, Fees, and Forfeitures" *in Reforming Criminal Justice – Volume 4: Punishment, Incarceration, and Release* 205, 209-11 (Erik Luna ed., 2017); *see also* John L. Worrall, *Addicted to the Drug War: The Role of Civil Asset Forfeiture as a Budgetary Necessity in Contemporary Law Enforcement*, 29 J. Crim.

Just. 171 (2001); Brent D. Mast, Bruce L. Benson & David W. Rasmussen, *Entrepreneurial Police and Drug Enforcement Policy*, 104 Pub. Choice 285 (2000).

Put differently, civil forfeiture is no longer primarily about targeting big-time criminals or addressing larger societal ills. In fact, it is hardly focused on crime reduction at all. Of the nearly $2.5 billion in self-reported monies collected and spent in 2014 under the Equitable Sharing program mentioned *supra* p. 6, *over 80%* "came from cash and property seizures in which no indictment was filed." Robert O'Hara, Jr., Steven Rich & Shelly Tan, *Asset Seizures Fuel Police Spending*, Wash. Post (Oct. 11, 2014), https://tinyurl.com/yj7evhxm.

Even the *proceeds* of civil forfeiture don't necessarily go towards crime fighting. As to the Equitable Sharing funds mentioned above, local law enforcement agencies use these funds for their own purposes with little accountability. The Oklahoma Highway Patrol, for example, spent millions related to salaries, overtime pay, construction, contractor fees, and even two Ford F-150 pickup trucks for non-law enforcement personnel, using funds received from the Equitable Sharing program between July 2009 and June 2012. O'Hara et al., *supra*.

The U.S. Department of Justice has examined the perverse incentives that are created when revenue generation becomes a priority to law enforcement agents. In the Department's report from one recent investigation into local abuses, the Department found that the City of Ferguson, Missouri's "emphasis on revenue generation has a profound effect on" the Ferguson Police Department's "approach to law enforcement," and produces "aggressive enforcement of Ferguson's municipal code, with insufficient thought given to whether enforcement strategies promote public safety or unnecessarily undermine community trust and cooperation." Civ. Rts. Div., U.S. Dep't of Just., *Investigation of the Ferguson Police Department* 2 (2015), https://tinyurl.com/2tr7audx. The Ferguson report details the City's longstanding objective to increase "productivity" from fines, to elevate officers based on the volume of traffic citations, and generally to prioritize revenue generation through the justice system. *Id.* at 9-14. The report concludes that these various practices uniformly and disproportionately impact African Americans. *See generally ibid.*

The egregious abuses attendant to civil forfeiture—where police are permitted to seize property with limited judicial oversight and retain it for their own use—are well-chronicled at this point. Police in the town of

Tenaha, Texas, for example, were exposed for regularly seizing property from out-of-town drivers, and then collaborating with the local district attorney to coerce those out-of-town drivers into signing waivers of their property rights. Stillman, *supra*. In one case, a couple driving with their sixteen-month-old child was pulled over, and although no drugs were found anywhere in the car or on their persons, were told they had two choices—they could sign over the $6,037 in cash they had with them to the City of Tenaha and get back on the road, or they "could face felony charges for 'money laundering' and 'child endangerment,' in which case they would go to jail and their children would be handed to foster care." *Ibid.*

Nelly Moreira, a Washington, DC resident who "relied on her 2005 Honda Accord to drive from her early-morning job, cleaning Trinity Washington University, to her evening job, cleaning the U.S. Treasury Department," was left nearly destitute after police pulled over her son who was driving the car and seized the car after a minor traffic violation. Stillman, *supra*. She was required to pay a bond of $1,020 just to have "*the right* to a complex and slow-moving civil-forfeiture court case." *Ibid.* (emphasis added). She was "left struggling to make her car payments

each month as her Honda sat in a city lot, unused." *Ibid.* It took months before the DC Public Defender Service won the release of her car. *Ibid.*

The Public Defender Service later brought a class action on behalf of nearly *four hundred* car owners like Moreira, describing the city's "policy as 'devastating for hundreds of families who depend on their cars for many of the urgent and important tasks of daily life.'" Stillman, *supra*. The class complaint "called for higher standards of proof and the end of penal-sum fees" like the $1,020 that was required for Moreira to engage in the proceedings at all. *Ibid.* How did the DC attorney general respond? By "warn[ing] that millions of dollars raised by forfeiture 'could very easily be lost' and 'an unreasonable burden' placed on his office" if the "burden of proof" were raised. *Ibid.*

A review of real-estate forfeitures in the Philadelphia area similarly exposed that homes there were "routinely seized for unproved minor drug crimes, often involving children or grandchildren who don't own the home." Stillman, *supra*. And the targets of such real-estate forfeitures were "overwhelmingly African-Americans and Hispanics." *Ibid.* (quotation marks omitted).

These revenue-generating forfeiture practices are politically appealing for lawmakers and law enforcement because they reduce taxes for the wider population, while burdening those least likely to fight back. Those who lack resources, who are thus most affected by civil forfeiture, are also among the least likely to vote. Daniel Weeks, *Why Are the Poor and Minorities Less Likely to Vote?*, The Atlantic (Jan. 10, 2014), https://tinyurl.com/2nrkc8n4. They are also less likely to have political sway through contributions or to have politically connected friends.

And even when legislatures attempt to rein in the unchecked abuses that flow from exceedingly permissive civil forfeiture statutes, they are met with stiff resistance from law enforcement. A bill filed in Alabama's legislature a few years ago, for example, would have restricted the use of civil forfeiture by requiring a conviction prior to forfeiture and by placing any forfeiture revenues in the State's general fund rather than directly with state law enforcement. But the presidents of the Alabama District Attorneys Association and Alabama Sheriffs Association publicly stated that if the bill were passed, prosecutors would file criminal charges in nonviolent and drug-offense cases against individuals who they believed would be better served in diversion programs, and otherwise stop

policing drug and property crimes. "What incentive would local police and sheriffs have to invest manpower, resources and time in these operations," they asked, if they did not benefit by receiving forfeiture funds? Brian McVeigh & Dave Sutton, *Don't Gut Civil Asset Forfeiture*, AL.com (Feb. 12, 2018), https://tinyurl.com/yv9nfh2f. Alabama law enforcement was ultimately successful in defeating all of the attempts at real reform. *See* Connor Sheets, *Alabama Asset Forfeiture Bill Went from Broad Reforms to 'Best We Can Do'*, AL.com (May 5, 2021), https://tinyurl.com/2yxc5pvx.

## III. Vulnerable communities are harmed the most when their property is taken.

Stories like those above have been garnering increasing attention for the past decade, including at the Supreme Court. "These forfeiture operations frequently target the poor and other groups least able to defend their interests in forfeiture proceedings." *Leonard*, 137 S. Ct. at 848. "Perversely, these same groups are often the most burdened by forfeiture." *Ibid.* That is in part because "they are more likely to suffer in their daily lives while they litigate for the return of a critical item of property, such as a car or a home." *Ibid.* Many "police officers" and "prosecutors" *themselves* have expressed worry "that state laws designed to go after

high-flying crime lords are routinely targeting the workaday homes, cars, cash savings, and other belongings of innocent people who are never charged with a crime." Stillman, *supra*.

Asset or property seizures that would be bearable (even if permissible) to many of us may well be beyond the ability of someone with few resources to recover. This in turn forces targets of few means into a vicious cycle of growing economic disaster, as can be seen from Moreira's story, described *supra* pp. 14-15. When the car she used to get between her jobs was seized, and she had to borrow the "penal sum" that DC required to prevent the car being auctioned off or otherwise used by local police, Moreira "was left struggling to make her car payments" on a car that remained sitting unused in a city lot. Stillman, *supra*. "'There were days,'" she shared, when she "'didn't have a good meal.'" *Ibid.*

The difficulties go beyond lack of resources. Criminal defendants like Mr. Jenkins often have to face both criminal and civil proceedings and can barely (if at all) afford a lawyer and the time required to fight such charges. Then, while their criminal proceedings are ongoing (or after surviving a long criminal proceeding), they are faced with civil forfeiture proceedings to boot. And the data show that "the forfeiture process

is far more complex and difficult to navigate than forfeiture proponents suggest." *Complex Process*, *supra*.

We aren't just talking about high value items like family homes, *see, e.g.*, Pamela Brown, *Parent's House Seized After Son's Drug Bust*, CNN (Sept. 8, 2014), https://tinyurl.com/yx7dunxx, or automobiles (like Moreira's or Mr. Jenkins'). Although, civil forfeiture was originally intended to target big-time criminals like "Colombian drug kingpin Pablo Escobar," Stillman, *supra*, the police in too many jurisdictions now seize even small amounts of cash during routine police encounters, *see, e.g.*, ACLU, *Guilty Property: How Law Enforcement Takes $1 Million in Cash from Innocent Philadelphians Every Year—and Gets Away With It* (June 2015), https://tinyurl.com/2s42rjbs.

* * *

Civil forfeiture as it has evolved into its modern form is used as a profit-generating tool rather than a method of keeping the public safe. Because law enforcement agents know that vulnerable communities lack the political power or resources to fight civil forfeiture, the underprivileged and racial minorities bear the brunt of the practice. Even in cases where no crime has been committed and no charges were ever brought,

the lower burden of proof the government must meet in civil proceedings allows it to seize and keep such property anyway. At the same time, vulnerable individuals are impacted the most when their property or money is taken.

The government wishes to go even further. It asks this Court to grant law enforcement the power to seize property and keep it, without the need for *any* procedural protections or compensation, so long as there is a law enforcement purpose at the outset. At a minimum, the government should be required to provide the procedures due in civil forfeiture proceedings to criminal defendants like Mr. Jenkins. And given the abuses that arise in the civil forfeiture realm, this Court should not allow the government to further perpetuate the cycle of financial ruin that seizures cause to impoverished individuals by stripping them of even the minimal protections that civil forfeiture affords.

## CONCLUSION

The Court should reverse the lower court's decision and remand for an evidentiary hearing to determine the amount of compensation to be awarded to Mr. Jenkins, or, at the very least, reverse and remand for any necessary further proceedings on Mr. Jenkins' claims.

May 27, 2022

Respectfully submitted,

s/ Daniel Woofter

Daniel Woofter
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636
dhwoofter@goldsteinrussell.com

*Counsel for Amicus Curiae Human Rights Defense Center*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2022-1378

**Short Case Caption:** Jenkins v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 3,916 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 05/27/2022 Signature: /s/ Daniel Woofter

Name: Daniel Woofter