No. 2022-1378

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

BRODRICK JAMAR JENKINS,

*Plaintiff-Appellant,*

*v.*

UNITED STATES,

*Defendant-Appellee.*

On Appeal from the United States District Court for the District of North Dakota in Case No. 3:19-cv-00188-ARS, Magistrate Judge Alice Senechal

## CORRECTED BRIEF FOR AMICI CURIAE PROFESSORS JULIA D. MAHONEY AND ILYA SOMIN IN SUPPORT OF PLAINTIFF-APPELLANT AND IN SUPPORT OF REVERSAL

MATTHEW T. MARTENS
DONNA M. FARAG
DOUGLAS W. GATES
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000

*Attorneys for Amici Curiae*

June 14, 2022

# CERTIFICATE OF INTEREST

Counsel for Amici Curiae Julia D. Mahoney and Ilya Somin certify the following:

**1. Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Julia D. Mahoney and Ilya Somin

**2. Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

**3. Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4. Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

None.

**5. Related Cases**. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

None.

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: June 14, 2022

/s/ Matthew T. Martens
MATTHEW T. MARTENS
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 663-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... iv

INTEREST OF AMICI CURIAE .......... 1

SUMMARY OF THE ARGUMENT .......... 2

ARGUMENT .......... 3

I. A TAKING UNDER THE POLICE POWERS IS NOT CATEGORICALLY EXEMPT FROM THE TAKINGS CLAUSE'S JUST COMPENSATION REQUIREMENT .......... 3

A. The history of the Takings Clause does not support the application of a police-powers exception. .......... 4

B. The Supreme Court has largely rejected attempts to impose categorical exceptions to physical takings, and this Court should also decline to do so .......... 10

C. A categorical police-powers exception unjustly permits the destruction of innocent persons' property without providing a remedy. .......... 16

II. *BENNIS* AND ITS PROGENY DO NOT GOVERN THIS CASE .......... 18

A. Neither *Bennis* nor *AmeriSource* required the outcome below .......... 20

1. *Bennis* applies only to legally forfeited property. .......... 21

2. *AmeriSource* dealt only with temporarily seized property related to an ongoing investigation. .......... 23

B. This Court should not expand *Bennis*'s application. .......... 27

CONCLUSION .......... 30

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Acadia Technology, Inc. v. United States*,
458 F.3d 1327 (Fed. Cir. 2006) ....................3, 25

*AmeriSource Corp. v. United States*,
525 F.3d 1149 (Fed. Cir. 2008) ....................19, 23, 25

*AmeriSource Corp. v. United States*,
75 Fed. Cl. 743 (2007) ....................24, 25, 26

*Arkansas Game & Fish Commission v. United States*,
568 U.S. 23 (2012) ....................11, 12, 13, 14

*Arkansas Game & Fish Commission v. United States*,
736 F.3d 1364 (Fed. Cir. 2013) ....................14

*Armstrong v. United States*,
364 U.S. 40 (1960) ....................17

*Austin v. United States*,
509 U.S. 602 (1993) ....................30

*Baker v. City of McKinney*,
No. 4:21-CV-00176, 2021 WL 5390550 (E.D. Tex. Nov. 18, 2021) ....................15

*Bennis v. Michigan*,
516 U.S. 442 (1996) ....................*passim*

*Brisbane v. Milano*,
No. 3:08-cv-1328, 2010 WL 3000975 (D. Ct. Jul. 27, 2010) ....................20, 21

*Cedar Point Nursery v. Hassid*,
141 S. Ct. 2063 (2021) ....................10, 11, 12

*Goldblatt v. Town of Hempstead*,
369 U.S. 590 (1962) ....................24

*Horne v. Department of Agriculture*,
576 U.S. 350 (2015) ....................*passim*

*In re Downstream Addicks*,
147 Fed. Cl. 566 (2020) .......... 15

*In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*,
146 Fed. Cl. 219 (2019) .......... 15

*Innovair Aviation, Ltd. v. United States*,
72 Fed. Cl. 415 (2006), *rev'd on other grounds*, 632 F.3d 1336 (Fed. Cir. 2011) .......... 19-20, 29

*Jenkins v. United States*,
No. 3:19-cv-188, 2021 WL 6618287 (D.N.D. Nov. 2, 2021) .......... 18, 19

*John Corp. v. City of Houston*,
214 F.3d 573 (5th Cir. 2000) .......... 15

*Lech v. Jackson*,
791 F. App'x 711 (Fed. Cir. 2019) .......... 17

*Leonard v. Texas*,
137 S. Ct. 847 (2017) .......... 28

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) .......... 13

*Lucas v. South Carolina Coastal Council*,
505 U.S. 1003 (1992) .......... 11

*National Board of Young Men's Christian Associations v. United States*,
395 U.S. 85 (1969) .......... 12, 13

*National Federation of Independent Business v. Sebelius*,
567 U.S. 519 (2012) .......... 3

*The Palmyra*,
12 Wheat. 1 (1827) .......... 22

*Penn Central Transportation Co. v. City of New York*,
438 U.S. 104 (1978) .......... 10

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393 (1922) .......... 15, 30

*Rafaeli, LLC v. Oakland County*,
952 N.W.2d 434 (Mich. 2020)....................19, 28

*Renthorp v. Bourg*,
4 Mart. 97 (La. 1816)....................9

*Seay v. United States*,
61 Fed. Cl. 32 (2004)....................21

*State ex rel. Pizza v. Rezcallah*,
702 N.E.2d 81 (Ohio 1998)....................28

*Timbs v. Indiana*,
139 S. Ct. 682 (2019)....................29

*United States v. Causby*,
328 U.S. 256 (1946)....................13, 14

*United States v. Romero*,
No. 1:12-cr-224, 2013 WL 625338 (D.N.D. Feb. 20, 2013)....................20

*United States v. Wilson*,
540 F.2d 1100 (D.C. Cir. 1976)....................24, 26

*Van Oster v. Kansas*,
272 U.S. 465 (1926)....................22

## CONSTITUTIONAL PROVISIONS, STATUTES, AND RULES

U.S. Const., art. I, § 8....................3

U.S. Const. amend. V....................4

Mass. Const. of 1780, part I, art. X....................7

1778 N.Y. Laws ch. 29....................7

Northwest Ordinance of 1787, art. 2....................7

Pennsylvania Const. art. VIII (Sept. 28, 1776)....................6

Vermont Const. ch. I, art. II (1786)....................7

1777 Virginia Acts ch. XII....................7

Virginia Declaration of Rights § 6 (June 12, 1776)....................................................6

Fed. R. Crim. P. 41....................................................................................................23

**OTHER AUTHORITIES**

1 Blackstone's Commentaries (1803)......................................................................5, 8

Balko, Radley, *A familiar story: D.C. police conduct violent home raids based on scant evidence*, Wash. Post (Mar. 7, 2016)..................................17

Brief of the Cato Institute and Professor Ilya Somin as Amici Curiae Supporting Petitioners, *Lech v. Jackson*, 141 S. Ct. 160 (2020) (No. 19-1123), 2020 WL 1929108 ............................................................ 8-9, 10

Brief of Constitutional and Property Law Professors as Amicus Curiae Supporting Petitioners, *Horne v. Department of Agriculture*, 576 U.S. 350 (2015) (No. 14-275), 2015 WL 1088971 ..........................................4, 8

Hunter, Zachery, *You Break It, You Buy It—Unless You Have a Badge? An Argument Against a Categorical Police Powers Exception to Just Compensation*, 82 Ohio St. L.J. 695 (2021) .........................16

Madison, James, *Property*, *reprinted in* 14 *The Papers of James Madison* (William T. Hutchison et al. eds., 1977) ..............................................8

*Massachusetts Body of Liberties* (1641)............................................................. 5-6

*Magna Carta*, 1215 (U.K.) ........................................................................................5

*Militarization of Police*, Charles Koch Institute (July 17, 2018), https://www.charleskochinstitute.org/issue-areas/criminal-justice-policing-reform/militarization-of-police/ ........................................................16

Somin, Ilya, *Federal Court Rules there is no Taking if the Police Destroy an Innocent Person's House During a Law Enforcement Operation*, Volokh Conspiracy (Oct. 31, 2019, 5:10 PM), https://reason.com/volokh/2019/10/31/federal-court-rules-there-is-no-taking-if-the-police-destroy-an-innocent-persons-house-during-a-law-enforcement-operation/.......................................................................4, 17

Somin, Ilya, *Testimony on Asset Forfeiture Before the Arkansas State Advisory Committee to the US Commission on Civil Rights*, Volokh Conspiracy (Apr. 5, 2019, 2:08 PM), https://reason.com/volokh/2019/04/05/testimony-on-asset-forfeiture-before-the/ ....................27, 28

Treanor, William Michael, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782 (1995)....................5, 9

Treanor, William Michael, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 Yale L. J. 694 (1985) ....................6, 8

## INTEREST OF AMICI CURIAE[1]

Amici curiae are law professors who have studied and written extensively about constitutional law. As leading scholars on the Takings Clause, amici have a significant interest in the issues presented in the case because the decision below misapprehends the history and precedent of the Takings Clause, impedes government accountability, and diminishes individual rights.

Julia D. Mahoney is the John S. Battle Professor of Law at the University of Virginia School of Law, where she teaches courses in property and constitutional law. Her scholarly articles include Kelo's *Legacy: Eminent Domain and the Future of Property Rights*, 2005 Sup. Ct. Rev. 103 (2006); *Federal Courts and Takings Litigation*, 97 Notre Dame L. Rev. 679 (2022); and Cedar Point Nursery *and the New Deal Settlement*, 11 Brigham-Kanner Prop. Rts. J. (forthcoming 2022).

Ilya Somin is a professor of law at the Antonin Scalia Law School, George Mason University. He has written and published extensively about Takings Clause and asset-forfeiture jurisprudence, including *Eminent Domain: A Comparative Perspective* (with Iljoong Kim and Hojun Lee, eds., 2017) and *The Grasping*

---

1 No counsel for any party authored this brief in whole or in part, and no person or entity other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief. Pursuant to Fed. R. App. P. 29(a)(2), all Parties have consented to the filing of this brief.

*Hand:* Kelo v. City of New London *and the Limits of Eminent Domain* (rev. ed. 2016).

## SUMMARY OF THE ARGUMENT

Federal law enforcement seized Brodrick Jenkins's vehicles as part of a criminal investigation. The government eventually concluded that it did not need the vehicles as evidence and did not pursue forfeiture; yet it failed to return the vehicles to Jenkins. The vehicles were eventually sold, and Jenkins sought compensation under the Fifth Amendment's Takings Clause. The Magistrate rejected Jenkins's claims and granted the government's motion for summary judgment. Relying in part on *Bennis v. Michigan*, 516 U.S. 442 (1996), a case about asset forfeiture, the Magistrate concluded that because the government acted under its police powers rather than its eminent-domain powers, the seizure of the automobiles was not a compensable taking.

Contrary to the Magistrate's conclusion, however, there is no blanket "police-powers" exception to the Takings Clause. The history of the Takings Clause shows that a government's exercise of its police powers can be a taking and, indeed, that there is no clear line between a police-power taking and eminent domain. The Supreme Court has also firmly rejected lower courts' attempts to manufacture categorical exceptions to the Takings Clause. And *Bennis*, which involved the constitutionality of asset forfeiture—an avenue the government did

not pursue here—is simply inapposite and does not undermine the proposition that a taking under the police powers still requires compensation.

## ARGUMENT

### I. A TAKING UNDER THE POLICE POWERS IS NOT CATEGORICALLY EXEMPT FROM THE TAKINGS CLAUSE'S JUST COMPENSATION REQUIREMENT

Contrary to the Magistrate's holding, there is no categorical "police-powers" exception to the Takings Clause.[2] This so-called exception, which has been invented or embraced by some lower courts, is unmoored from the history of the Takings Clause and from Supreme Court precedent. This section explains: (1) why the history of the Takings Clause shows that exercises of the police power can be takings; (2) why a blanket "police-powers" exception contravenes existing Supreme Court precedent; and (3) the consequences of courts unjustifiably embracing a categorical "police-powers" exception.

---

[2] Despite the frequency with which courts refer to the Federal Government's "police powers," *see, e.g.*, *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1332-1333 (Fed. Cir. 2006), the Supreme Court has clarified that the federal government lacks the police powers retained by states under the Constitution, *see NFIB v. Sebelius*, 567 U.S. 519, 536 (2012). We assume that by "police power," the Magistrate's order referred to federal law enforcement's authority to enforce legislation that Congress passed under one of its enumerated powers. U.S. Const., art. I, § 8.

### A. The history of the Takings Clause does not support the application of a police-powers exception.

The Takings Clause of the Fifth Amendment states: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. A "classic taking [is one] in which the government directly appropriates private property for its own use." *Horne v. Department of Agriculture*, 576 U.S. 350, 357 (2015) (alteration in original) (citation omitted). This definition applies equally to the appropriation of personal property. "The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home." *Id.* at 358; *see also* Brief of Constitutional and Property Law Professors as Amici Curiae Supporting Petitioners, *Horne,* 576 U.S. 350, (2015) (No. 14-275), 2015 WL 1088971 (arguing that the Constitution does not distinguish between real and personal property). Nothing about the text, history, or original meaning of the Takings Clause supports the proposition that the government's obligation to compensate a property owner ceases when law enforcement effects a taking. *See* Somin, *Federal Court Rules there is no Taking if the Police Destroy an Innocent Person's House During a Law Enforcement Operation*, Volokh Conspiracy (Oct. 31, 2019, 5:10 PM), https://reason.com/volokh/2019/10/31/federal-court-rules-there-is-no-taking-if-the-police-destroy-an-innocent-persons-house-during-a-law-enforcement-operation/.

The principle that takings, even by law enforcement, must be compensated comes from Magna Carta, which provided that "[n]o free man shall be … disseised … except by the lawful judgement of his peers or by the law of the land" and that "[n]o constable or other bailiff shall take corn or other provisions from anyone without immediately tendering money therefor, unless he can have postponement thereof by permission of the seller." *Magna Carta*, 1215, cl. 28, 39 (U.K.). Centuries later, William Blackstone advocated for compensation requirements for real property, asserting that a taking of private land without an owner's consent could happen only at the legislature's direction and "by giving [the owner] a full indemnification and equivalent for the injury thereby sustained." *See* Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 786 n.15 (1995) [hereinafter *Original Understanding*] (quoting 1 William Blackstone, Commentaries *139).

These principles were incorporated in some early colonial documents. *Horne*, 576 U.S. at 358. Notably, the 1641 Massachusetts Body of Liberties imposed a compensation requirement for the seizure of *personal* property, "prohibiting 'mans Cattel or goods of what kinde soever' from being 'pressed or taken for any publique use or service, unlesse it be by warrant grounded upon some act of the generall Court, nor without such reasonable prices and hire as the ordinarie rates of the Countrie do afford.'" *Id.* (quoting Massachusetts Body of

Liberties ¶ 8, in Perry, Sources of Our Liberties 149 (1978)). By the time of the American Revolution, several states had begun embracing the principle that takings were subject to the consent of the property owner or elected representatives. Virginia, for instance, declared that persons who owned enough property for suffrage "cannot be taxed or deprived of their property for public uses without their own consent or that of their representative so elected." Va. Declaration of Rights § 6 (June 12, 1776). The Pennsylvania Constitution similarly guaranteed to those subject to a militia-service requirement that their property could not be "justly taken … or applied to public uses" without their consent. Penn. Const. art. VIII (Sept. 28, 1776).

In light of the abuses during the Revolutionary War, issues of uncompensated takings became highly salient to early Americans. *See Horne*, 576 U.S. at 359. With the War came uncompensated takings of real and private property for a variety of purposes: "Loyalist property was seized. Undeveloped land was taken for roads. Goods of all types were impressed for military use." Treanor, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 Yale L. J. 694, 698 (1985) (citations omitted) [hereinafter *Just Compensation*]. John Jay decried "military impressment by the Continental Army of 'Horses, Teems, and Carriages,' and voiced his fear that such action by the 'little Officers' of the Quartermasters Department might extend to

'Blankets, Shoes, and many other articles.'" *Horne*, 576 U.S. at 359 (citations omitted).

These practices gave rise to explicit compensation requirements in legislation enacted during the war, then in some state constitutions, and eventually in the Federal Constitution. The New York State Legislature responded to Jay's concerns by enacting a law that "provided for compensation for the impressment of horses and carriages." *Horne*, 576 U.S. at 359 (citing 1778 N.Y. Laws ch. 29). Virginia similarly permitted the military to seize surplus livestock only upon payment to the owner of "the price so estimated by the appraisers." *Id.* (quoting 1777 Va. Acts ch. XII). After the War, Vermont and Massachusetts incorporated compensation requirements into their constitutions. *See* Vt. Const. ch. I, art. II (1786) ("[W]henever any particular man's property is taken for the use of the public, *the owner ought to receive an equivalent in money*."); Mass. Const. of 1780, part I, art. X ("And whenever the public exigencies require that the property of any individual should be appropriated to public uses, *he shall receive a reasonable compensation therefor*."); *see also* Northwest Ordinance of 1787, art. 2 ("[S]hould the public exigencies make it necessary for the common preservation to take any person's property, or to demand his particular services, *full compensation shall be made for the same*.") (emphases added).

James Madison "synthesize[d these] revolutionary era trends" and "gave them substance and coherence" when he drafted the Takings Clause, hopeful that it would "have broad moral implications as a statement of national commitment to the preservation of property rights." Treanor, *Just Compensation*, *supra*, at 708. To Madison, the government existed to "protect property of every sort, as well that which lies in the various rights of individuals, as that which the term particularly expresses." Brief of Constitutional and Property Law Professors at 10, *supra* (citing James Madison, *Property*, *reprinted* in 14 *The Papers of James Madison* 266-268 (William T. Hutchison et al. eds., 1977)). St. George Tucker, a Virginia jurist who was the first to opine on the interpretation of the Takings Clause, affirmed that it "was probably intended to restrain the arbitrary and oppressive mode of obtaining supplies for the army, and other public uses, by impressment, as was too frequently practised during the revolutionary war." 1 Blackstone's Commentaries, Editor's App. 305-306 (1803) (quoted in *Horne*, 576 U.S. at 359).

The war takings that drove the drafting and adoption of the Just Compensation Clause *were* police-power, physical takings—the type of takings that the Magistrate here held were categorically (and paradoxically) excluded from the Fifth Amendment's right to compensation.[3] *See* Brief of the Cato Institute and

---

[3] Indeed, an early case interpreting the Northwest Ordinance suggested that the compensation requirement was limited to takings of goods that were intended

Professor Ilya Somin as Amici Curiae Supporting Petitioners at 8, *Lech v. Jackson*, 141 S. Ct. 160 (2020) (No. 19-1123), 2020 WL 1929108. Indeed, the introduction of a compensation requirement signified a departure from previous approaches in which legislative consent alone justified a taking and ensured that compensation was no longer dependent on the whims of legislative bodies. Treanor, *Original Understanding*, *supra*, at 825. During the Revolution, the normal safeguards of the political process were inadequate to protect against uncompensated takings "because the military was engaging in unsanctioned and forcible acts of confiscation. Unchecked by political decisionmakers who because of distance could not effectively monitor the military's actions, the military was free to single out individuals and take their property without providing redress." *Id.* at 836.

In short, the Fifth Amendment's Takings Clause was the culmination of developments that increased individual property rights by restricting the government's power to expropriate both personal and real property from individuals for the state's benefit—particularly when armed forces acted independently without democratically accountable, legislative supervision. Here, too, federal executive branch employees seized property—without legislative or statutory authorization—singling out Jenkins and providing him with no redress.

---

to further war efforts, *not* for the seizure of real property for the development of public infrastructure. *Renthorp v. Bourg*, 4 Mart. 97, 132-133 (La. 1816).

To hold, therefore, that such police seizures are outside the scope of or excluded from the Takings Clause's guarantees is to disregard the very impetus behind the Clause and turn it on its head.

### B. The Supreme Court has largely rejected attempts to impose categorical exceptions to physical takings, and this Court should also decline to do so.

The Supreme Court's physical takings jurisprudence—"as old as the Republic"—has made clear that "[w]hen the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (citations omitted). Physical appropriations are the "clearest sort of taking," and are "assess[ed] … using a simple, *per se* rule: The government must pay for what it takes." *Id.* (collecting cases).

While physical takings are typically actionable, regulatory takings usually are not. *See* Brief of the Cato Institute and Professor Ilya Somin as Amici Curiae, *supra*, at 8-13. This is because regulatory takings do not transfer control of the property, render the property unusable, or otherwise rise to the level of a physical taking. *Compare Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978) (holding that restrictions on the ability to exploit superadjacent airspace were not a taking where they did not transfer control of the property and allowed owners to

realize a reasonable rate of return on their investment), *with Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) (holding that restrictions barring property owner from erecting permanent habitable structures were a taking where they deprived the owner of all economically beneficial use), *and Cedar Point*, 141 S. Ct. at 2072 ("Whenever a regulation results in a physical appropriation of property, a per se taking has occurred, and *Penn Central* has no place."). The Court's distinction between physical and regulatory takings has nothing to do with whether the government is exercising its police or eminent-domain powers. For good reason: Such a distinction has no basis in the history of the Clause, and as a practical matter, attempting to draw a line between a government's eminent-domain powers and its police powers is a fruitless exercise; the two are nearly coterminous.

Beyond the distinction between physical and regulatory takings, however, the Supreme Court has largely rejected categorical exclusions to the Takings Clause. *See, e.g.*, *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012) (emphasizing that takings claims generally require fact-specific inquiries). In *Arkansas Game & Fish*, the Commission sued the federal government because the Army Corps of Engineers had authorized periodic floodings, the repeated effect of which was the destruction of timber. 568 U.S. at 29. This Court held that no taking occurred because the flooding was only

temporary. *Id.* at 30. The Supreme Court rebuffed this Court's manufactured exception, clarifying that "[n]o decision of this Court authorizes a blanket temporary-flooding exception to our Takings Clause jurisprudence" and "declin[ing] to create such an exception in this case." *Id.* at 34. While acknowledging that it had imposed some bright lines before (namely, "that a permanent physical occupation of property authorized by government is a taking"), the Court made clear that "most takings claims turn on situation-specific factual inquiries." *Id.* at 31-32. The Court echoed this principle again in *Cedar Point*, reiterating that a physical appropriation is a taking, even if it is only temporary or intermittent. 141 S. Ct. at 2074-2075.

What is more, the Supreme Court has also refrained from suggesting that a taking at the hands of law enforcement is not compensable. In *National Board of Young Men's Christian Associations v. United States*, 395 U.S. 85, 86 (1969), the Court faced the question of whether the U.S. Army's efforts to quell riots in the Panama Canal Zone by occupying plaintiffs' buildings was a taking. The Court held that the seizure of property was not a taking, but its analysis rested on the fact that plaintiffs were the intended beneficiaries of the Army's use of its police powers. *Id.* at 92. A contrary holding, the Court concluded, would make "governmental bodies … liable under the Just Compensation Clause to property owners every time policemen break down the doors of buildings to foil burglars

thought to be inside." *Id.* Implicit in the Court's reasoning is the assumption that the government may be liable for a law enforcement taking in certain situations. Indeed, the Justices posited different hypotheticals in examining the factual contours for a takings claim against law enforcement., but none suggested that the exercise of the police power barred a finding that a compensable taking had occurred. *See id.* at 96 (Harlan, J., concurring) ("It is only if the military or other protective action foreseeably increased the risk of damage that compensation should be required."); *id.* at 99 (Black, J., dissenting) (opining that the taking was for the public benefit and that plaintiffs were entitled to compensation).

* * * *

To be clear—and to assuage any concerns to the contrary—the rejection of a categorical police-powers exception to the Takings Clause does not mean that the government is *necessarily* liable for every seizure under the police power. The Supreme Court has repeatedly rejected attempts to impose blanket exceptions for fear of a "slippery slope" that would "unduly impede the government's ability to act in the public interest." *Arkansas Game & Fish*, 568 U.S. at 36 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425-426 (1982) (holding "a permanent physical occupation" of property is a taking even where the regulation authorizing the occupation "is within the State's police power" if it "so frustrates property rights that compensation must be paid"); *United States v.*

*Causby*, 328 U.S. 256, 261-262 (1946) (holding frequent overflights of land by military aircraft at low altitudes constituted the taking of an easement because the overflights interfered with the use and enjoyment of the land)). Just as "[t]he sky did not fall after *Causby*" and it did not fall after *Arkansas Game*, *id.*, it will not fall if this Court rejects a categorical police-powers exception. Whether police-power takings that follow the common law rules of nuisance or that are intended to benefit the property owner are covered by the just-compensation requirement is a different issue for another case. As the Supreme Court has instructed, courts are to "weigh carefully the relevant factors and circumstances in each case," *id.* at 36, as they are charged with doing in so many other contexts.

Indeed, some courts have properly followed the Supreme Court's repeated instructions to look to the specific facts of each case in determining what constitutes a taking. This Court has already done so when *Arkansas Game* was remanded; it affirmed the trial court's opinion assessing factors such as duration, causation, foreseeability, and severity, to conclude that the government's temporary occupation was a taking. *Arkansas Game & Fish Comm'n v. United States*, 736 F.3d 1364 (Fed. Cir. 2013). And the Fifth Circuit, recognizing that municipal regulations governing land use are exercises of a city's police power, has announced that the "distinction between the use of police powers and of eminent domain … cannot carry the day. The Supreme Court's entire 'regulatory

takings' law is premised on the notion that a city's exercise of its police powers can go too far, and if it does, there has been a taking." *John Corp. v. City of Houston*, 214 F.3d 573, 578 (5th Cir. 2000) (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). Some district courts have applied that reasoning to hold that a municipality can be held liable for damage done to an innocent owner's property by police apprehending a suspect—a clear exercise of the police power. *See Baker v. City of McKinney*, No. 4:21-CV-00176, 2021 WL 5390550, at *7-8 (E.D. Tex. Nov. 18, 2021) (citing *John Corp.*, 214 F.3d at 578). And the Court of Federal Claims has already assessed takings claims against the federal government for flooding houses after Hurricane Harvey based on each case's individual facts—without relying on blanket rules about the government's police powers. *Compare In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs*, 146 Fed. Cl. 219, 263 (2019) (concluding that the police-powers defense did not apply and that the government effected a compensable taking), *with In re Downstream Addicks*, 147 Fed. Cl. 566, 575 (2020) (rejecting plaintiffs' takings claims primarily based on their causation theory).

If this Court heeds the Supreme Court's guidance and embraces a fact-specific approach in takings cases involving the police powers, the government will not be left without defenses to liability. But if this Court applies a blanket

police-powers exception, innocent persons whose property is destroyed will be the ones left with no recourse.

### C. A categorical police-powers exception unjustly permits the destruction of innocent persons' property without providing a remedy.

The police-powers exception not only contravenes the Takings Clause's original meaning and Supreme Court precedent: It is fundamentally unjust. The application of a police-powers exception has ramifications that go beyond this case. As law enforcement increasingly employs militarized tactics in its daily operations, more and more innocent people have endured the wreckage of their property—and the police-powers exception bars them from any recovery. *See* Hunter, *You Break It, You Buy It—Unless You Have a Badge? An Argument Against a Categorical Police Powers Exception to Just Compensation*, 82 Ohio St. L.J. 695, 709 (2021); *see also Militarization of Police*, Charles Koch Inst. (July 17, 2018), https://www.charleskochinstitute.org/issue-areas/criminal-justice-policing-reform/militarization-of-police/ (noting that one study "found that use of paramilitary-style teams by law enforcement increased by more than 1,400 percent since 1980."). Law enforcement home raids have been catastrophic for innocent home owners. In one raid, police's attempt to capture a suspected shoplifter who had entered an innocent person's home left "[p]rojectiles … still lodged in the wall[ and g]lass and wooden paneling crumbled on the ground below the gaping

holes." Somin, *Federal Court Rules there is no Taking*, *supra* (citation omitted). Although "it looked as though the … police had blasted rockets through the house," *id.*, the owner was denied compensation under the so-called police-powers exception, *Lech v. Jackson*, 791 F. App'x 711 (Fed. Cir. 2019).

These destructive raids have also been plagued with devastating mistakes. *See generally* Balko, *A familiar story: D.C. police conduct violent home raids based on scant evidence*, Wash. Post (Mar. 7, 2016). In one home raid, "[t]he police tore out drywall and crushed family photographs," never finding evidence of "drugs, weapons, or evidence of criminal activity." *Id.* One investigation found that in Washington, D.C., such raids, often "based on little or no evidence," are almost always conducted on Black residents. *Id.*

To be sure, whether these raids are necessary or justified is not the issue here. The question is who should bear the costs associated with law enforcement's efforts to protect the public—society at large or individual property owners? The Takings Clause provides the answer: the government cannot "[f]orc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

## II. *BENNIS* AND ITS PROGENY DO NOT GOVERN THIS CASE

The Magistrate's order looked to neither the rationale for nor the original public meaning of the Takings Clause. Instead, the order applied a handful of distinguishable precedents to conclude that "the Fifth Amendment takings clause does not encompass a claim for just compensation for property seized under governmental police power under the facts of this case." *Jenkins v. United States*, No. 3:19-cv-188, 2021 WL 6618287, at *5 (D.N.D. Nov. 2, 2021). Even assuming those precedents were correctly decided, however, none requires this Court to conclude that the government may take a criminal defendant's property—without seeking a forfeiture judgment—and fail to compensate him after the fact.

Every case the Magistrate cited for the proposition that the government has no obligation to compensate owners whose property is taken under the police power hearkens to two sentences in *Bennis*:

> [I]f the forfeiture proceeding here in question did not violate the Fourteenth Amendment, the property in the automobile was transferred by virtue of that proceeding from petitioner to the State. The government may not be required to compensate an owner for property *which it has already lawfully acquired* under the exercise of governmental authority other than the power of eminent domain.

516 U.S. at 452 (emphasis added). In that case nearly three decades ago, the Supreme Court dramatically expanded the reach of civil forfeiture laws by holding that a state may seize property involved in the commission of a crime—even when there was no allegation that the vehicle's principal use was for committing

crimes—and that the state had no obligation under the Takings Clause to compensate an innocent joint owner for her interest in the property, despite her lack of knowledge about the crime. *See id.* To this day, *Bennis* remains on constitutionally shaky ground, and courts have hesitated to expand its reach. *See, e.g.*, *Rafaeli, LLC v. Oakland Cty.*, 952 N.W.2d 434, 447-448 (Mich. 2020) ("The Court's holding in *Bennis* focused narrowly on forfeited property that was used as an instrumentality for criminal activity and the government's interest in deterring illegal activity.").

Nevertheless the Magistrate applied *Bennis's* rationale even where the government (1) never sought the forfeiture of Jenkins's vehicles, (2) retained the property after its law-enforcement investigation concluded, and (3) disposed of the property and retained the proceeds. *See Jenkins*, 2021 WL 6618287 at *4 (citing *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1150 (Fed. Cir. 2008)). In concluding that the government's permanent deprivation of Jenkins's property was not a compensable taking, the Magistrate only cited cases involving property that was either forfeited or eventually returned to its rightful owner. *See id.* at *3-4.

Were the Court to endorse the Magistrate's reasoning, the effect would be to "allow the Government to seize and forfeit the property of any person" and then "to dispose of the property before there is any chance for a substantive review of the forfeiture." *Innovair Aviation, Ltd. v. United States*, 72 Fed. Cl. 415, 424

(2006), *rev'd on other grounds*, 632 F.3d 1336 (Fed. Cir. 2011). Because the Magistrate relied on distinguishable precedents, because those precedents are themselves constitutionally suspect, and because further expanding their reach would dramatically enlarge the government's power to take citizens' property without constitutional safeguards, the Court should reverse.

### A. Neither *Bennis* nor *AmeriSource* required the outcome below

The Magistrate's brief analysis of Jenkins's Takings claim cited four cases. Two were district court opinions that relied on *AmeriSource* to reject claims that were eminently distinguishable from the facts at bar. The first dismissed a criminal defendant's claim that the government had "taken" his right to own a firearm when it prosecuted and convicted him for possessing a firearm while being a felon. *See United States v. Romero*, No. 1:12-cr-224, 2013 WL 625338, at *5 (D.N.D. Feb. 20, 2013). That case essentially involved a Second-Amendment challenge to a criminal law restricting the use of firearms that was styled as a *pro se* motion lodging a Takings claim within the context of a criminal proceeding. It has no relation to either the facts or claims at issue here.

The second dealt with the government's seizure of a car that was involved in the commission of a crime and ultimately sold at auction *pursuant to a stipulated forfeiture*, with the rest eventually returned to the owner. *See Brisbane v. Milano*, No. 3:08-cv-1328, 2010 WL 3000975, at *5-7 (D. Ct. Jul. 27, 2010). The court

rejected the plaintiff's claim that the car's depreciation while in storage during the investigation's pendency was a compensable taking, relying in part on the fact that the car's value was eventually returned to its owner in accordance with an approved forfeiture agreement. *See id.* (citing *Seay v. United States*, 61 Fed. Cl. 32, 35 (2004) ("There is no taking associated with the retention of property *that [the government] ultimately returned*.") (emphasis added)). Jenkins's case is readily distinguishable: there was no forfeiture agreement and he never received either his property or monetary compensation.

### 1. *Bennis* applies only to legally forfeited property.

The two remaining appellate decisions cited by the Magistrate do not support her decision. In *Bennis*, the state prosecuted a husband for soliciting a prostitute while using a vehicle that he and his wife jointly owned. *See* 516 U.S. at 443. Following conviction, the state sued both spouses, seeking to declare the vehicle a public nuisance and abate it under relevant Michigan laws. *Id.* at 444. Mrs. Bennis claimed that the abatement would violate both the Fourteenth Amendment's Due Process Clause and the Fifth Amendment's Takings Clause, arguing that she had no knowledge of her husband's intent to use the vehicle for criminal purposes and that abating the car without compensating her for her interest would leave her without transportation. The Michigan courts nevertheless abated the vehicle. *Id.* at 444-446.

Writing for the majority of the U.S. Supreme Court, Chief Justice Rehnquist looked to admiralty cases involving the transportation of contraband, *see, e.g.*, *Bennis*, 516 U.S. at 446-447 (citing *The Palmyra*, 12 Wheat. 1 (1827)), and revenue and Prohibition-era cases involving bootlegging, *see, e.g.*, *id.* at 447-448 (citing *Van Oster v. Kansas*, 272 U.S. 465 (1926)). Based on those cases, the Court held that a forfeiture inquiry turns not on the owner's innocence or guilt, but rather on the property's role in the crime's commission. *See id.* at 447-452. The Court also stressed forfeiture's "deterrent purpose distinct from any punitive purpose." *Id.* at 452. Finally, the Court briefly touched on Bennis's Takings Claim, holding in a single paragraph that "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." *See id.* at 452.

The distinctions between the scenario here and that in *Bennis* are evident. *Bennis* looked to whether an *innocent* owner's property may be taken when the property itself was *guilty* through association with the crime. Here, a guilty *defendant* has lost property that—by the government's own admission—had nothing to do with the crime. Moreover, *Bennis*'s takings holding was entirely dependent on the government having "lawfully acquired" the property "under the exercise of governmental authority other than the power of eminent domain,"

*Bennis*, 516 U.S. at 452, a condition that the government has failed to fulfill here. The opinion said nothing about a general police-power exemption to the Takings Clause.

#### 2. *AmeriSource* dealt only with temporarily seized property related to an ongoing investigation.

In *AmeriSource*, this Court had to determine whether the Takings Clause requires the government to compensate an innocent owner when it seizes property in support of a law-enforcement investigation if, by the time the investigation concludes and the government returns the property to the owner, the property has lost all value. 525 F.3d at 1152. The government seized over $150,000 worth of pharmaceuticals owned by AmeriSource but in the possession of another corporation, whose owners were indicted for alleged criminal offenses. *See id.* at 1150. The government denied AmeriSource's request for the return of its property, and the district court rejected AmeriSource's motion under Federal Rule of Criminal Procedure 41 because the government was contemplating using the property as evidence in the criminal proceedings. *See id.* at 1150-1151. By the time the case concluded, the expired drugs had lost all value. *See id.* at 1151.

In considering AmeriSource's takings claim, the Court of Federal Claims took a modest approach to the government's argument that no taking occurs when the government seizes property under its police powers rather than via eminent domain. To define "the line between compensable and noncompensable

governmental action," the court considered "the entire process—including the Government's justifications for maintaining custody of the property and the magistrate's recommended disposition of Plaintiff's motion for its return—in order to determine, as an objective matter, whether the alleged deprivation is aimed at obtaining a public use or benefit, or whether it furthers a police function." *AmeriSource Corp. v. United States*, 75 Fed. Cl. 743, 749 (2007). The court rejected the government's suggestion "that its police power is unlimited and not subject to a standard of reasonableness." *See id.* (citing *United States v. Wilson*, 540 F.2d 1100, 1103-1104 (D.C. Cir. 1976) ("[d]iscussing duty of the trial court to ensure the return of property seized during an investigation once it is no longer needed for evidentiary purposes"); *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594-595 (1962) (the "exercise of police power must be necessary to protect the public interest and not unduly oppressive to the property owner")).

Under that standard, the court found that the government's "retention of property as evidence" was "a reasonable exercise of the Government's police power." *AmeriSource*, 75 Fed. Cl. at 749. It based that conclusion on its finding that "the Government [did] not seek to convert Plaintiff's property for public use but rather to temporarily retain the property in order to perfect a case against those who intended to use the property in the furtherance of a criminal enterprise." *Id.*

The potential for the evidence's spoliation was, if anything, an unfortunate collateral effect. *Id.*

On appeal, this Court stated that "it is clear that the police power encompasses the government's ability to seize and retain property to be used as evidence in a criminal prosecution," and therefore that "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings clause." *AmeriSource*, 525 F.3d at 1153. To validate this bright-line rule, the Court first looked to the seizure of counterfeit manufactured goods by customs inspectors, who eventually dropped the forfeiture action and returned the goods only after they had outlived their shelf life. *See id.* (citing *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1329 (Fed. Cir. 2006)). Second, the Court cited *Bennis*, stating that "*Bennis* suggests that so long as the government's exercise of authority was pursuant to some power other than eminent domain, then the plaintiff has failed to state a claim for compensation under the Fifth Amendment." *Id.* at 1154 (citing *Bennis*, 516 U.S. at 453). That conclusion, of course, appears nowhere in *Bennis*.

In any event, *AmeriSource* and *Acadia* dealt with the question of whether an innocent property owner must be compensated for property's depreciation while it is in the government's temporary custody as "evidence" in a law enforcement investigation. In neither case did the government permanently "convert [the]

property for public use." *AmeriSource*, 75 Fed. Cl. at 749. Here, however, Jenkins has made no claim for his vehicles' depreciation while in government custody, and the government does not claim that it obtained title to the vehicles under its police powers or any other lawful mechanism. To date, the government has not asserted any legal authority that would allow it to retain the proceeds from the sale of Jenkins's vehicles under either *Bennis* or *AmeriSource*.[4]

A single sentence from *Bennis* relating to forfeited property led this Court to conclude, as an absolute matter, that the Takings Clause has no role to play when the Government renders property worthless while holding it pursuant to a law-enforcement investigation. Whether or not that proposition is true, the Magistrate's leap to the follow-on proposition that the Takings Clause has no role to play when the Government sells the property and keeps the money, without a forfeiture judgment or even any basis for asserting that the property was related to the crime, went too far. Neither *Bennis* nor *AmeriSource* requires that result.

---

[4] To the extent the government argues that the impound lot, rather than the government, is in possession of the proceeds and that the vehicles' sale was not carried out for public use, *Wilson* suggests that such distinctions are "an argument of administrative inconvenience" that "can be accorded no weight, particularly where, as here, the inconvenience appears to be minor, the property is appellant's, and … the disposition of the money was a decision almost by indecision." 540 F.2d at 1104 (internal quotation omitted).

### B. This Court should not expand *Bennis*'s application

Even if *Bennis's* Takings Clause holding were directly applicable here, it is not clear that *Bennis* is constitutionally sound. Courts and legal scholars are engaged in serious debate over the extent to which the Constitution allows law enforcement agencies to pursue the forfeiture of assets "even if the owner was never charged with a crime, much less convicted of one." Somin, *Testimony on Asset Forfeiture Before the Arkansas State Advisory Committee to the US Commission on Civil Rights*, Volokh Conspiracy (Apr. 5, 2019, 2:08 PM), https://reason.com/volokh/2019/04/05/testimony-on-asset-forfeiture-before-the/. These "seizures occur with little or no due process protections for the owners, thereby enabling the government to hold onto the property [f]or months at a time, before the owner has any chance to contest the seizure." *Id.*

Even when the Supreme Court decided *Bennis*, Justice Thomas, one of the five justices in the majority, expressed misgivings when he wrote in a separate concurrence that "[t]he limits on *what* property can be forfeited as a result of what wrongdoing—for example, what it means to 'use' property in crime for purposes of forfeiture law—[were] not clear to [him]." *Bennis*, 516 U.S. at 455 (Thomas, J., concurring). Justice Thomas noted that, "[i]mproperly used, forfeiture could become more like a roulette wheel employed to raise revenue from innocent but hapless owners whose property is unforeseeably misused, or a tool wielded to

punish those who associate with criminals, than a component of a system of justice." *Id.*

Justice Thomas's predictions proved to be prescient and remain relevant today. As he stated a few years ago, "civil forfeiture has in recent decades become widespread and highly profitable." *Leonard v. Texas*, 137 S. Ct. 847, 848 (2017) (Thomas, J., respecting the denial of certiorari). Although he noted that the Supreme Court "has justified its unique constitutional treatment of civil forfeiture largely by reference to a discrete historical practice that existed at the time of the founding," Justice Thomas questioned whether the modern civil asset forfeiture practices are consistent with the historical practice due to their expanded scope and the tendency to seek forfeiture against owners who have not been accused of a crime, thereby depriving them of the due-process protections typically afforded criminal defendants. *Id.* at 849-850.

It is therefore unsurprising that courts have limited their application of *Bennis* where it is not directly controlling. *See, e.g.*, *Rafaeli*, 952 N.W.2d at 447-448 (distinguishing *Bennis* as applying only where forfeiture statutes have punitive or deterrent purposes and therefore inapplicable where, as here, "plaintiffs did not use their properties for illicit purposes"); *State ex rel. Pizza v. Rezcallah*, 702 N.E.2d 81, 90-93 (Ohio 1998) (distinguishing *Bennis* as focused on "remedial purposes" that were not served where innocent landlords had their properties

closed due to crimes committed by prior tenants, which the court found to be an improper use of the police power and therefore a compensable taking); *Innovair*, 72 Fed. Cl. at 424 (distinguishing *Bennis's* holding that legally forfeited property does not implicate the Takings Clause because there, as here, the property was not subject to forfeiture).

To the extent that the constitutionality of civil asset forfeiture is in question, it stands to reason that governmental appropriations of property *in the absence of any sort of forfeiture judgment* cannot be considered a valid exercise of the police power. In that vein, this Court should decline to accept the Magistrate's invitation to extend the holding in *AmeriSource* beyond its application to property that loses its value while in government custody but is nevertheless returned to the rightful owner when the investigation concludes. That is especially true at a time when the Supreme Court has become more protective of property rights against government appropriation, *see, e.g.*, *Horne*, 576 U.S. 350, and more skeptical of forfeiture, *see, e.g.*, *Timbs v. Indiana*, 139 S. Ct. 682 (2019) (incorporating the Eighth Amendment's Excessive Fines Clause against state civil *in rem* forfeitures). As the Court stated in *Timbs*, "the protection against excessive fines has been a constant shield throughout Anglo-American history," including when "fines [have been] employed in a measure out of accord with the penal goals of retribution and deterrence." 139 S. Ct. at 689 (quotation marks omitted). *See also id.* ("[T]his

Court [has] held that civil *in rem* forfeitures fall within the Clause's protection when they are at least partially punitive." (citing *Austin v. United States*, 509 U.S. 602 (1993))).

To uphold the Magistrate's order, this Court must conclude that the Takings Clause provides no protection when the government (1) seizes property pursuant to a law-enforcement investigation, (2) determines that the property had nothing to do with the crime, (3) concludes its investigation, (4) sells the property at auction, and (5) retains the proceeds for public use. Neither *Bennis* nor *AmeriSource* compel that outcome, and if they did, they would be inconsistent with the Fifth Amendment. When the Takings Clause's "seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States." *Pennsylvania Coal Co. v Mahon*, 260 U.S. 393, 415 (1922).

## CONCLUSION

A blanket police-powers exception to the Takings Clause has no support in the original meaning of the Takings Clause or Supreme Court precedent. And cases involving asset forfeiture do not undermine the principle that a taking under the police powers is still compensable. For these reasons, this Court should reverse the Magistrate's grant of summary judgment for the government.

Respectfully submitted,

/s/ Matthew T. Martens
MATTHEW T. MARTENS
DONNA M. FARAG
DOUGLAS GATES
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

*Attorneys for Amici Curiae*

June 14, 2022

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1. The filing has been prepared using a proportionally-spaced typeface and includes 6,979 words.

2. The brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Matthew T. Martens
MATTHEW T. MARTENS
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

June 14, 2022